[Civ. No. 16795.   Second Dist., Div. One.   July 1, 1949.]

BOYD H. McCLELLAND, Appellant, v. ACME BREWING COMPANY (a Corporation), Respondent.

George C. Bliss for Appellant.

Crider, Runkle & Tilson for Respondent.

DRAPEAU, J.—This action arises out of injuries sustained by plaintiff when a bottle of beer exploded.

Plaintiff was a bartender employed by a catering company which had a concession at the Bonelli Ranch at Saugus.   He was transferring a bottle of beer from its case to a tub of ice-cooled water when the bottle broke with a pop or flash, resulting in the loss of plaintiff's left eye.

Defendant Acme Brewing Company was the manufacturer and bottler of the beer, and defendant Bohemian Distributing Company had exclusive distributing rights of all beer made by Acme.

At the close of plaintiff's case, the trial court granted motions for nonsuit of both defendants, made on the ground that there was no proof of negligence on their part which caused or contributed to the accident.

This appeal is directed against the judgment of nonsuit in favor of Acme Brewing Company, it being contended that the evidence was sufficient to raise an issue of fact for the jury's determination.

It is well established that "A motion for a nonsuit may not be granted where there is evidence of sufficient substantiality to support a finding for the plaintiff, and in arriving at a conclusion on the question the evidence should be viewed most favorably to the plaintiff with every legitimate inference drawn in her favor and conflicts disregarded. (*Barnett* v. *LaMesa Post No. 282*, 15 Cal.2d 191 [99 P.2d 650], and cases there cited.)" (*Milana* v. *Credit Discount Co.*, 27 Cal.2d 335, 342 [163 P.2d 869, 165 A.L.R. 621].)

On the subject of exploding bottles the following appears in *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 517 [204 P.2d 522]: "In *Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453 [150 P.2d 436], it was pointed out that a sound bottle of carbonated liquid does not ordinarily explode if it is carefully handled. Where a bottle containing liquid under pressure does explode causing injury the plaintiff is entitled to the benefit of the doctrine of res ipsa loquitur to supply an inference that the bottler was negligent, either in excessively charging the liquid, or in failing to discover a flaw in the bottle, if it is probable under the evidence that the defendant was negligent in either respect."

The court in the Gordon case held that the doctrine of res ipsa loquitur applied only where the instrumentality causing the injury was subject to the control of the defendant, and quoted from the Escola case, *supra,* that "the doctrine may be applied upon the theory that defendant had control at the time of the alleged negligent act, although not at the time of the accident, *provided* plaintiff first prove that the condition of the instrumentality had not been changed after it left the defendant's possession." Further, "that a plaintiff may rely on the doctrine of res ipsa loquitur 'if there is evidence permitting a reasonable inference that it [the exploded

bottle] was not accessible to extraneous harmful forces and that it was carefully handled by plaintiff or any third person who may have moved or touched it.' (*Escola* v. *Coca Cola Bottling Co., supra*, 24 Cal.2d 453, 458.)''

In the Gordon case there was evidence showing that defendant was negligent in failing to make any of the standard tests for the detection of flaws in the bottles it distributed.

In the Escola case, the court held that plaintiff was entitled to rely on the doctrine of res ipsa loquitur to supply an inference of defendant's negligence for the reason that, while it did not clearly appear whether the explosion was caused by an excessive charge or a defect in the glass, it was shown ''that neither cause would ordinarily have been present if due care had. been used''; defendant having exclusive control over both the charging and inspection of the bottles.

In the instant cause there was evidence that in 1945 about 60 per cent of the bottles used in bottling Acme beer were old or used bottles returned to Acme by Bohemian. It was also shown that the following method of inspection is customary: Employees of Bohemian examine the bottles at the Acme plant before they are placed in the machinery there; three men then inspect the bottles as they go into the washing machine called a ''soaker,'' where the bottles are kept separate. They are there tempered in tanks of caustic solution at 110, 170, 150 and 90 degrees Fahrenheit, respectively, flushed with clear water, scrubbed with nylon brushes and then sprayed with fresh water. As they come out of the washing machine, the bottles are checked by an operator for flaws, after which they ''go before a light, a flourescent light that lights up the bottle for a man who sits in front of this particular light and inspects those bottles.'' Thereafter the bottles proceed to the filling machine where they are filled with beer and capped; they are again inspected and the filled bottles placed in the pasteurizing machine. The bottles come out of the washer at 90 degrees and are pasteurized at 140 degrees. Next they are labeled and packed in wooden cases with wooden dividers, placed on conveyor belts and sent to the end of the production line for delivery to Bohemian Distributing Company.

The assistant bottle shop superintendent for Acme testified that from 50 to 60 bottles per month blow up after they are filled, and three, four or five bottles a day after they come out of the pasteurizer; that the workers on the production line and the men handling the cases at the end of the line are all

required to wear safety glasses; and that in marketing the beer, it is anticipated that it will be cooled before consumed and that the bottles probably will be warm when put into a cold temperature for such cooling. In answer to the question ''Do they test the bottles to see if they could go through that process and still have a nick in them? Did you ever know of them to make such a test?'' this witness stated: ''Yes, we have made many tests and have had glass experts test them. . . . Q. You don't do that as a regular procedure, do you, Mr. Keane? A. You mean every bottle? Q. You don't pick out every three hundredth bottle and make a test? . . . Or fifty or every three thousand, do you? A. We are selling beer at twenty cents a bottle. We couldn't take out every bottle and examine it.''

Mr. William W. Harper, a consulting physicist, testifying as an expert stated that stretching of glass is the basic cause of failure; that a sound bottle of beer would not fracture if taken from ordinary weather temperature on a reasonably hot day and placed in cold water that had come from ice melting; that the conditions of temperature change, as outlined in the hypothetical question based on testimony produced by plaintiff, were not sufficient to cause a normally sound bottle to explode; and that in his opinion there was a latent defect of some type which was triggered off by the change of temperature; that the tests used at the Acme plant as described by the bottle shop superintendent were not sufficient to fracture every bottle that was not perfectly sound; and that the inspection described by such superintendent by means of fluorescent lights was not sufficient to discover each and all defects in the glass; that cordiness in glass cannot be discovered by the fluorescent lamp; and that each individual bottle would have to undergo tests and examination for possibly five or six minutes to be reasonably certain there was not some serious defect present. This witness also testified ''There is no single test or combination of tests in my opinion which are absolutely infallible in diagnosing or predicting ultimate failure of glass.''

Plaintiff presented evidence to the effect that the case of beer containing the bottle which exploded suffered no damage at any stage of its transportation from the time of its delivery to Bohemian at the Acme plant until the accident occurred, to wit:

The case in question was one of 200 cases transported from the Acme plant to Bohemian's Burbank warehouse in trucks

operated by the Wade Transportation Company during the month of September, 1945. The cases were delivered by the conveyor at Acme directly to the trucks of the Wade Company acting as transportation agent, and were loaded on the trucks by employees of Wade without removal of the bottles from their compartments in the cases. The trucks were backed to a platform and unloaded by the Wade Company employees onto a conveyor into the Burbank warehouse; once in a while bottles were broken. The warehousemen, employees of Bohemian, would stack the cases and would also place the cases on trucks for delivery to purchasers. During all the time cases remained in the warehouse, the bottles were in the divided partitions and on occasions, bottles exploded. The average turnover of beer at the Burbank warehouse was from three to four days.

The Wade Transportation Company had no record of any accident to its trucks in transporting the beer prior to September 7, 1945, and Bohemian employed a safety supervisor whose duty was to instruct the drivers and warehousemen in the use of care in handling beer in cases. The purpose of wooden dividers in the cases was to keep the bottles from knocking together.

Defendant Roy D. Galvez, a driver for Bohemian, delivered the 200 cases of beer from the Burbank warehouse to the Bonelli Ranch, where he unloaded it and placed it in the open warehouse, from which place plaintiff obtained the beer. Galvez testified that in delivering and unloading the beer, he had no accident; there was no rough handling; that he was careful in handling the cases and they were not bumped together. During the time he handled the beer, the bottles remained in their cases.

Plaintiff went to Bonelli's Ranch on September 9, 1945, and prior to the accident, he had taken several cases of Acme beer by means of a truck from the warehouse, a screened building 25 to 30 feet square, to the cooling tubs which was a distance of about 300 feet; that no one moved any of the beer from the warehouse except himself and no one helped him unload it or place it in the tub of ice-cooled water. The bottle broke under the following circumstances, in the words of the plaintiff: "I had the case setting there. It had two bottles in it. I took one in each hand. I went over to the tub and put them in the water, and as I did one of the bottles broke as I hit the water. . . . it just popped. . . . Kind of flash. . . . Something hit me in the eye."

In *Gordon* v. *Aztec Brewing Co., supra* (33 Cal.2d 514, 518), the course of the beer there involved was traced as follows: ''The cases were loaded on trucks of the LaSalle Trucking Company at the defendant's San Diego plant; LaSalle drivers delivered them to a warehouse of the Associated Brewers Distributing Company in Los Angeles where they remained about three days; on August 22 the case which contained the bottle that exploded was delivered by an Associated driver to the plaintiff. Evidence was presented which showed that LaSalle trucks were not involved in accidents during August, 1944; that no accidents occurred in the Associated warehouse that month which might have affected the beer; that the driver who delivered the case to the plaintiff was not involved in an accident en route and did not bump the case; that it was in excellent condition on delivery, and that the plaintiff handled the case and bottle carefully. While this evidence was not conclusive it was the jury's province to determine, after being properly instructed, whether the plaintiff had sufficiently proved the absence of intervening harmful forces after the defendant shipped the bottle to entitle plaintiff to rely on an inference inherent in the doctrine that the defendant's lack of care was the proximate cause of his injury.''

Likewise in the cause here under review, plaintiff presented a prima facie case of negligence sufficient to permit the reliance by him on the doctrine of res ipsa loquitur pursuant to the principles enunciated by the Escola and Gordon cases, *supra*. As a result, the judgment of nonsuit in favor of defendant Acme Brewing Company was improper.

The judgment is reversed.

White, P. J., and Doran, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 25, 1949.