57 N.J. Super. 480 (1959)
155 A.2d 154
MARY P. GINNELLY, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILLIAM GINNELLY, DECEASED, PLAINTIFF-RESPONDENT,
v.
THE CONTINENTAL PAPER COMPANY, A CORPORATION, AND/OR ALFORD CARTONS, JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1959.
Decided October 26, 1959.
*484 Before Judges GOLDMANN, FREUND and HANEMAN.
*485 Mr. James P. Beggans argued the cause for defendants-appellants (Messrs. Beggans and Keale, attorneys; Mr. Robert E. Tarleton on the brief).
Mr. Joseph V. Cullum argued the cause for plaintiff-respondent (Messrs. Townsend & Doyle, attorneys).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff, widow and sole dependent of William Ginnelly, instituted this action as administratrix ad prosequendum to recover the pecuniary loss sustained by her resulting from the alleged wrongful death of her husband while in defendants' warehouse. N.J.S. 2A:31-1 et seq. The decedent was in the employ of the O'Neill Detective Agency and was assigned as a guard on the premises of the defendant corporations, The Continental Paper Company and Alford Cartons, in the Borough of Bogota, N.J. He sustained a fractured skull and other injuries causing death on Sunday, April 3, 1955, undoubtedly while attempting to place a new electric light bulb in a fixture hanging from the ceiling of the second story of the warehouse. Defendants' negligence, as stated in the complaint and in the pretrial order, was in supplying Ginnelly with a defective ladder which assertedly collapsed as he attempted to make an ascent thereon to come within reach of the suspended socket.
A jury of the Law Division found evidence sufficient to support the claim of negligence on the part of the defendants and, over defense motions for judgment made at the close of the proofs and after the return of the verdict, judgment was entered in favor of the plaintiff for $33,500. A subsequent motion for relief from the judgment under R.R. 4:62-2(b), (c) and (f) was denied. Defendants appeal from the judgment as entered and from the trial judge's unchanging refusal to grant relief therefrom.
Some of the facts are not in dispute. Pursuant to a contract with the O'Neill Detective Agency, defendants' promises were patrolled by about eight or nine armed and *486 uniformed guards employed by O'Neill. They worked in three shifts, three guards on duty on each shift. The guards were supervised generally by a Captain Norman D. Coyle, who stationed himself at a gatehouse. In making their rounds, the guards were required to call in to Captain Coyle every hour. They were to inform him of anything unusual on the premises. It was Coyle's job to bring such matters to the attention of the appropriate representative of the defendants.
The accident occurred on April 3, 1955, Palm Sunday. Ginnelly reported for work at 8:00 A.M. and went about his rounds, which covered defendants' three buildings. He was required to make "21 rings" of the two-story building known as the warehouse. The plant was not operating that day, and there was but a "skeleton crew" on hand doing repairing work "and stuff like that." On Sundays, fellow-guard Lawrence V. Orland replaced Coyle as supervisor at the gatehouse. As usual, Ginnelly called in to his temporary superior at 11:00 A.M. At noon he did not call in, nor at 1:00 P.M. Eventually Orland called the police to have a search made of the premises. At about 3:00 P.M. the decedent was found lying on the first floor of the warehouse at or near a stairwell containing a stairway leading to the second floor. He was dead. Next to him lay the upper section of a two-piece ladder, a shattered light bulb, a paper book, a uniform police cap, and a pair of eyeglasses. The bottom section of the ladder was found upstairs on the second floor. Near the base of the bottom portion of the ladder, an electric light bulb carton was lying on the floor. A uniform coat was hanging from an upright and Ginnelly's revolver was on a crossbeam next to it.
There were no eyewitnesses to the decedent's tragic death, but what befell him is a matter of fair inference from the proofs. The light fixture hung directly over the stairwell, about 16 feet above the floor of the second story. There was testimony that on Saturday, April 2 the bulb therein had been burned out, and it was still out when the police *487 found Ginnelly on Sunday. It is clear that the decedent had tried to replace the light bulb and that he had approached it by means of a ladder.
The particular ladder he used was identified as being one which had been used by defendants' maintenance men in the two-week period prior to the accident. The photographs in evidence show the words "Paint Shop" on the ladder. It was composed of two sections. Each section was 12 feet long, the ladder having a maximum extension of 24 feet. Ordinarily, however, it was used to reach heights of 14 or 15 feet, and the testimony indicates the ladder was unsafe if used to approach a point more than 18 feet from the ground. At the base of the ladder were metal safety skids on each of the ribbon strips. Attached to each of the two skids was a rubber mat which, when the ladder was operating properly, gripped the floor and prevented slippage. There was a set of L-shaped iron rungs or clips on each section which were intended to hold the ladder firm when it was extended. The ladder had no rope. Although the ladder was impounded by defendants on the day of the accident, it was not produced at the trial by them, nor was it subpoenaed by plaintiff. R.R. 4:46-2.
The width of the stairwell was 7' 2"; its length, 14' 6". As one came up the stairs to the second floor, he would find upon reaching the top step that the distance from the steps to a cinder-block wall on his right was slightly over 2 feet. On his left would be found a railing, about 3 or 4 feet in height, which protected users of the second floor from stepping into the stairwell.
Ginnelly had moved the base of the ladder close to this railing, rested the top section against the wall, and in that fashion attempted to reach the light fixture over the stairwell. While he was on the ladder, the two parts became disengaged. The top section and Ginnelly plunged down into the stairwell and were found on the first floor. The bottom section came to rest in an angled position, the top rungs thereof on the railing and projecting over the stairwell, *488 and the base thereof on the floor, 10' 4" from the stairwell.
In addition to the foregoing, the police found fresh skid marks running from the stairwell to the point where the base of the ladder had come to rest. Two of the marks were parallel, the distance between them being the same as the width of the ladder. A third skid mark on the floor was shorter and more irregular. On the wall were two skid marks starting 17' 6" from the floor and running "upward." These marks were 5' to 7' long and were the same width as the upper portion of the ladder.
The theory of plaintiff's case was that the safety rubber skids at the base of the ladder were worn out and that such defect proximately caused the ladder to slip away from the railing and wall, with the result that Ginnelly was projected onto the steps leading to the first floor. Additionally, negligence was predicated on the fact that the ladder did not have a rope as an added safety feature; a rope, it was claimed, would have prevented any slippage even if the iron clips jumped out of place, or at least would have prevented the top section from becoming totally disengaged from the bottom section in the event of slippage. In connection with the last hypothesis, plaintiff reasons that if the ladder had remained an integral assembly, the decedent would have been prevented from falling to the first floor by the ladder itself, both sections of which would presumably have come to rest across the stairwell with the decedent still on it.
The general thesis developed by defendants on this appeal is that the evidence was insufficient to establish, as a matter of probability, that any negligence on their part caused, proximately or otherwise, the decedent's accident. Much less, it is argued, did the circumstantial proof exclude, as it must, the idea that the accident was due to a cause with which the defendants were unconnected. Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 141 (1951). Specifically, it is urged (1) defendants owed no duty to Ginnelly since there was no proof that he had authority to replace light *489 bulbs on the premises, and no proof that he was impliedly invited to use a ladder in the process; (2) the trial court erred in admitting the testimony of an "expert" which was so general and unreliable as to be worthless, and there was no other competent testimony to establish any defect in the ladder or any other breach of duty with causal effect.
In inquiring into the cogency of defendants' abnegation of duty to the decedent, we begin with the observation that he, as an employee of an independent contractor that was hired to guard defendants' premises, occupied the status of an invitee upon such premises as long as he remained in the area he was invited to enter and as long as he used the premises in an authorized manner. Since the decedent was an invitee, defendants' duty was to exercise ordinary care to render the premises reasonably safe for the purposes embraced in the invitation. Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 219 (1954); Lokar v. Church of the Sacred Heart, 24 N.J. 549, 552 (1957); Bergquist v. Penterman, 46 N.J. Super. 74, 82, 83 (App. Div. 1957), certification denied 25 N.J. 55 (1957); 2 Harper & James, The Law of Torts, § 27.12, p. 1481 (1956). This general rule is not without circumscriptions. One is that the owner or occupier is not liable where the invitee is injured while using the premises in an unauthorized manner; his liability is but co-extensive with the invitation. See, e.g., Phillips v. Library Co., 55 N.J.L. 307, 315 (E. & A. 1893). It is the latter principle which is sought to be invoked by the defendants in the present case. There is no denial that the decedent was in an authorized place, but defendants seek to establish that the plaintiff's husband exceeded both his authority and the bounds of the invitation in replacing light bulbs and in making use of their ladder to do it.
The basis of this contention lies in an interpretation of the facts to which we cannot subscribe. There is no dispute that the guards were never expressly given authority or instructions to replace light bulbs. Indeed, fellow-guard *490 Orland testified that Captain Coyle told him at times, "Don't change no bulbs." Another guard, Robert A. Baum, testified, however, that he had not been enjoined by his superior from changing bulbs. In view of this contradiction, and of the rule requiring an assessment of the evidence and proper inferences therefrom in the light most favorable to plaintiff, Martin v. Bengue, Inc., 25 N.J. 359, 362 (1957), it was for the triers of the facts to determine whether Ginnelly was under instruction not to engage in the activity he did.
There was ample evidence from which the jury could have properly concluded that the decedent remained within the bounds of his invitation. It could have found that the normal procedure was that each guard was to note on his daily written report which bulbs needed replacement; that defendants' electricians were to act on the basis of these reports; that the guards had written "many a times bulbs were out; this is wrong; that is wrong"; that the electricians did not replace the bulbs; that "this condition went on for weeks," requiring the guards, as Orland put it, to "change them ourselves, for our own security and the security of the other men and the employees of the Company." Baum testified that in the four-month period prior to the accident, he had replaced from 50 to 75 bulbs. Orland testified he replaced 100 to 150 bulbs in a three-year period, at times as many as 7 a week. Notwithstanding the instructions he said had been given him, Orland "got so sick of writing them reports out, that's when [he] started replacing the bulbs * * *."
Captain Coyle, testifying for defendants, denied any knowledge his men were replacing bulbs, but he did agree there were many occasions when his report of burned-out bulbs went unheeded by Continental personnel. Coyle stated he never instructed the guards about not replacing bulbs, and he recalled one day when the decedent had said, "I would rather put in a bulb than write about it."
*491 The defendants produced two of Continental's supervisory employees to discredit the testimony of Orland and Baum that bulbs were replaced by guards on a mass scale. The foreman of the storeroom where new bulbs were kept and the supervisor of maintenance denied having seen any requisitions for new bulbs signed by the O'Neill guards. There was thus placed before the jury the alternative hypothesis that the guards were nefariously secreting new light bulbs from the storeroom, all unknown to defendants.
In our judgment, reasonable men could differ on whether an implied invitation was extended to decedent to replace bulbs as part of his guard duties. Artificial illumination was clearly needed and it was not being provided (only 3 out of 14 bulbs on the second story were functioning on the day preceding the accident). It was not a deviation (from strictly guard duties) of any jural consequence for a daytime guard such as decedent to replace a bulb for the protection of nighttime guards and the defendants' employees. The activity was intended to be for the benefit of the defendants, and upon such benefit alone might the conclusion be based that at the time of the accident the decedent was defendants' invitee. Hendrikson v. Koppers Co., Inc., 11 N.J. 600, 607 (1953); 2 Harper & James, op. cit., supra, § 27.12, p. 1478. The same result follows from the prescription that "Whether or not the invitee stayed within the confines of the invitation is usually an issue for the jury." Gudnestad v. Seaboard Coal Dock Co., supra, 15 N.J. at page 219; Hendrikson v. Koppers Co., supra, 11 N.J. at pages 606-607. We are satisfied that the guards were impliedly authorized to replace light bulbs and that their activity in this respect was but reasonably incidental to patrolling the premises, and therefore not such a deviation as to warrant acceptance of the defendants' contention that the effort involved venturing beyond the scope of the invitation.
Having found that the decedent remained within the scope of his invitation in changing light bulbs, we must next *492 consider the substantive duty owed him by defendants, and this before appraising the sufficiency of the evidence to create a jury question as to default in any such duty. Defendants argue they were under no duty to provide a reasonably safe ladder to this plaintiff or to any other guard (as distinguished from persons expressly authorized to use ladders on the premises) because they did not know he would use it and hence could not foresee the likelihood of any harm to him. The contention is that it is not enough that the O'Neill guards were in fact obtaining light bulbs from the defendants' storeroom and installing them in light fixtures, or that they were justified in so doing. The claim is that knowledge of such activity must be brought home to defendants before they can be charged with the obligation to provide reasonably safe equipment. See 65 C.J.S. Negligence §§ 4e, 5, 51 (1950). In this regard, it should be noted that there was nothing in the testimony of Orland and Baum to indicate that they ever changed a light bulb in the presence of any of defendants' supervisory personnel, or that anyone in authority at the storeroom had ever given bulbs to the guards. Compare Snyder v. I. Jay Realty Co., 53 N.J. Super. 336, 347 (App. Div. 1958), reversed in part 30 N.J. 303 (1959), where we considered the extent to which an employer would be bound by the knowledge of its foreman of the commission of an allegedly unauthorized act on the premises.
We are compelled to consider this argument in view of the fact that the failure to provide a safe ladder was the sole theory upon which this case was tried; no contention was made by plaintiff that defendants were chargeable with possible negligence of the maintenance department in failing to install bulbs as needed, or with negligence in failing to provide adequate illumination on the second floor of the warehouse. We therefore express no opinion as to whether there was negligence in either of those respects, or if there was, whether such was a proximate cause of the fatal injuries for which the administratrix brought suit.
*493 On the motion for judgment notwithstanding the verdict, the trial judge reasoned that the changing of bulbs by guards had become such a practice that the defendants either knew of it or should have known of it. In support of his conclusion, he noted the fact that the defendants had provided the guards with batteries for their searchlights and hence "were aware * * * that these guards were necessarily going into various parts of the building where illumination was necessary." He stated that the defendants, as reasonable persons, must have known that searchlights would not provide sufficient illumination, therefore should have expected the guards to install bulbs, and in consequence should have assumed that a ladder permitted to lie about on the premises would be used for the purpose. He cited Constantine v. Delaware, L. & W.R. Co., 12 N.J. Misc. 518, 172 A. 803 (Sup. Ct. 1934), to support his finding that the defendants were chargeable with constructive knowledge of a practice being carried on "over a long period of time."
This is persuasive reasoning. But defendants would distinguish the Constantine case on the ground that there the "particular method of operation" by which the decedent met his death had been "invoked" for a long period of time, but that here there is no proof that the "particular method" (use of a ladder) had been previously "invoked" by decedent or any other guard. But this is not a meaningful distinction. So long as the defendants knew or should have known the guards were replacing bulbs, they had a duty to provide reasonably safe equipment with which to make the change. It is not necessary that the defendants should have foreseen the particular manner in which the guards would attempt to change bulbs; it is enough that they should have foreseen that harm would result if the proper equipment was not provided. Bacak v. Hogya, 4 N.J. 417, 424 (1950); Barbarisi v. Caruso, 47 N.J. Super. 125, 130, 131 (App. Div. 1957). "Foreseeability does not mean that the precise hazard or the exact consequences which were encountered should have been foreseen." 2 Harper & James, op. cit., *494 supra, § 20.5, p. 1147. The rationale of the Constantine case is applicable here.
There can be no doubt that the defendants were chargeable with knowledge of the guards' replacement of bulbs, and not only for the reasons set forth by the trial judge. Orland testified that about a month prior to the accident he had to tell the foreman "in charge of the maintenance men" that "the electrician refused to change the bulb." If it was true that defendants' supervisors knew the electricians were not replacing bulbs as requested, defendants would have concluded that the guards were changing bulbs. An appraisement of the evidence in plaintiff's favor requires us to find this was the case.
We proceed to a discussion of the propriety of the trial action, first in admitting expert testimony concerning defects in the ladder, and then in permitting the jury to find on the strength of this testimony a breach of the duty outlined above. Orland testified that when he saw the ladder at the scene on the day of the accident, he "got down" and, without lifting the ladder off the floor, "looked at" the rubber treads on the bottom of the safety skids. He observed that the metal portions of the skids were "flat on the floor" and that this was the case because the rubber treads were "well worn out." On cross-examination he stated he did not know how thick the rubber should have been and that he "just took a look at it." If the jury believed that the treads were worn down, then it could reasonably infer that this condition caused the ladder to slip and that, since wearing is a gradual process, defendant had constructive notice of the defect. See, e.g., Kahalili v. Rosecliff Realty, Inc., 46 N.J. Super. 1, 6, 7 (App. Div. 1957), reversed on other grounds 26 N.J. 595 (1958); Prosser, Torts (2d ed. 1955), § 78, p. 459.
Plaintiff did not rest with Orland's testimony. The theory of liability was supported by Thomas Connolly, a "construction expert and construction engineer," who testified as such. Connolly never observed the floor of defendants' *495 warehouse and never saw the ladder in question. Nevertheless he studied a number of photographs of the scene prior to the trial, and he testified on the basis of his inspection of the photographs. These photographs were admitted into evidence. This method of eliciting expert testimony of a defect in the ladder was objected to, but the trial judge overruled the objection on the ground that an expert could render an opinion from a photograph, just as he could from a hypothetical question stating the facts which appeared in the photograph. This ruling was clearly correct and in no sense an abuse of the trial judge's discretion. In Woyak v. Konieske, 237 Minn. 213, 54 N.W.2d 649, 33 A.L.R.2d 1241 (Sup. Ct. 1952), it was said:
"Nor do we believe that foundation is lacking because the opinion of Almy was based on photographs instead of an examination of the wrecked automobiles. It is common practice for medical experts to base their opinions upon X-rays and other similar descriptive evidence or upon hypothetical questions. Defendant was given free range to cross-examine regarding the accuracy of the photographs. The fact that the opinion was based on photographs instead of an examination of the automobiles might conceivably affect its weight, but would not render it inadmissible because of a lack of foundation if the witness were otherwise qualified and the photographs were sufficiently descriptive and clear so that they presented the facts necessary to enable the witness to form an opinion with the necessary degree of accuracy." (54 N.W.2d at page 655, 33 A.L.R.2d, at page 1249)
See 32 C.J.S. Evidence § 558, p. 368, text at n. 49; Annotation, "Expert testimony to interpret or explain or draw a conclusion from photograph," 77 A.L.R. 946 (1932). Cf. Klein v. Boylan, 115 N.J.L. 295 (Sup. Ct. 1935).
Connolly thereupon testified that on the photograph depicting the bottom section of the ladder as it came to rest after the accident, there was a space shown between one of the metal feet and the floor. This space indicated, in his opinion, "either a bent angle through there, or some of the rubber is missing off the bottom of the clip itself." He said if the ladder were "in perfect condition it should be flat on the floor." He further stated a rope was essential *496 if this type of ladder was to be used safely, but on cross-examination admitted that he had never seen a "push-up ladder." It was defendants' position that the ladder in question was of the "push-up" variety, which was claimed not to require a rope.
Defendants interpose numerous objections to the admission of Connolly's testimony: that it was "completely lacking in proper foundation"; "worthless"; that the photograph depicting the space under the foot was not a true representation of the position of the ladder when the decedent placed it against the wall; that the space may well have been caused by the angled position of the ladder as it was resting on the stairwell railing; that the slightest pressure on the ladder would have eliminated any space; and that it was flush on the floor when the decedent was upon it.
In our judgment, these criticisms go to the weight of Connolly's testimony and not to its admissibility. As was observed in Skupienski v. Maly, 27 N.J. 240, 246 (1958), an expert's testimony may be doubtful or weak but at the same time sufficient to create a factual conflict requiring jury determination. We think Connolly's testimony was of this nature. Moreover, since his testimony was merely cumulative as regards the wearing away of the rubber treads, its admission did not prejudice defendants. R.R. 1:5-3(b).
We have assiduously examined the supplemental brief, arguing that the verdict should be set aside under R.R. 4:62-2 because Connolly's testimony as to his qualifications was false. The argument is based on the fact that Connolly has since been convicted of false swearing on his plea of non vult for having falsely represented in another action that he had graduated from Catholic University with a degree in architectural engineering. The same misrepresentation was made by Connolly to the jury in the instant case.
It is familiar law that a motion for a new trial is addressed to the sound discretion of the trial court, and the exercise of such discretion will not be distributed on appeal *497 unless it has been clearly abused. State v. Bunk, 4 N.J. 482, 485 (1950). R.R. 4:62-2 authorizes relief from a final judgment for the following reasons, among others:
"(b) newly discovered evidence which would probably alter the judgment, order or proceeding and which by due diligence could not have been discovered in time to move for a new trial under Rule 4:61-2; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; * * * (f) any other reason justifying relief from the operation of the judgment or order."
There are several reasons for concluding that the court's denial of defendants' motion on the basis of the cited rule should not be disturbed. First, it is well settled that verdicts will not be upset on the basis of newly discovered evidence which is merely impeaching or contradictory. State v. Smith, 29 N.J. 561 (1959); State v. Jones, 57 N.J. Super. 260 (App. Div. 1959).
But more fundamentally, the test is whether the evidence of the plea and conviction, if competent, would probably alter the judgment. In view of the undisputed fact that the witness had four years of preparatory engineering at Stevens, four years of architectural engineering at Catholic University (without receiving a degree), and 38 years' experience in the construction and engineering business, we are not prepared to say that the trial judge abused his discretion in ruling that a correct statement of Connolly's qualifications would not probably alter the result.
Other points raised in the briefs do not require serious consideration. On the whole case, we agree with the trial judge's characterization of it as being "very close." We also agree, however, that it was for the jury to conclude as they did that the decedent's death was, more probably than not, proximately caused by the defendants' negligence.
The judgment is affirmed.