[Civ. No. 24401. Second Dist., Div. Three. Dec. 6, 1960.]

DORIS VIRGINIA POGGETTO et al., Appellants, v.
EARL C. OWEN et al., Respondents.

Allard, Shelton & O'Connor and Herbert Hafif for Appellants.

Hagenbaugh, Murphy & Meifert, Van A. Hagenbaugh and Early, Maslach, Foran & Williams for Respondents.

VALLÉE, J.—Appeal by plaintiffs from an adverse judgment entered on a jury verdict in an action for the alleged wrongful death of Carlo Poggetto, a police officer of the city of Pomona. Plaintiffs are his widow and minor children. The cause was tried on the issue of liability. The verdict for defendants was unanimous.

The points urged for reversal are claimed erroneous rulings

in the admission of evidence and irregularity in the proceedings of the jury.

The accident occurred about 6:50 p. m. on March 11, 1957. The sun set that day at 5:57 p. m. and it was dark at the time of the accident. Officer Poggetto was southbound on Towne Avenue in Pomona on a Harley-Davidson police motorcycle. Defendant Owen, sometimes referred to as defendant, was driving an automobile easterly on Jefferson Street and making a left turn to go north on Towne. Defendant Pacific Fruit Company owned the car driven by Owen. Jefferson intersected Towne, forming a T intersection. Towne was a boulevard. There was a boulevard stop on Jefferson. In the 1,200 feet north of Jefferson, Towne was intersected from the west by three streets and four alleys. In that 1,200 feet Towne was intersected from the east by three streets and two alleys. All intersections were T type; no street crossed Towne. At the point of the accident Towne was 68 feet wide with a concrete divider; Jefferson was 40 feet wide. The painted stop line on Jefferson was 20 feet west of the west curb of Towne. The San Bernardino Freeway was about six-tenths of a mile north of the scene. From that point to south of the scene the speed limit on Towne was 25 miles an hour.

Ronald McIntyre was traveling north on Towne. About three-tenths of a mile north of the freeway and about nine-tenths of a mile north of the scene of the accident, he was stopped by Officer Poggetto. The officer had pursued McIntyre for a short distance without any red light or siren on. He then flashed the red lights. He did not sound a siren at any time. The officer was in the process of writing a speeding ticket when a car southbound on Towne passed at high speed. The officer started after the southbound car. He started so rapidly he "burned rubber." He went north about 75 yards, made a U turn at an opening in the divider, and pursued the southbound car. As he passed McIntyre he was going about 55 miles an hour. When he passed out of McIntyre's sight he was going an estimated 70 miles an hour.

Marguerite Butcher entered Towne several blocks north of the scene of the accident driving an automobile. She proceeded south in the lane next to the west curb. A Volkswagen came up alongside of her shortly before the accident. Poggetto, on his motorcycle, passed between her car and the Volkswagen. Mrs. Butcher became aware of the motorcycle officer on seeing a red light blinking in her outside rear-view mirror. The motorcycle was one to two car lengths behind

her. After passing her, the motorcycle was directly in front of her. When she first saw defendant Owen's car it was "just moving onto Towne Avenue"; "it was moving steadily out into Towne Avenue"; it was in the same lane of traffic she was in. At that time the officer was about 195 feet north of the intersection; he was at least half a block away. Mrs. Butcher testified the Owen car traveled about one car length after she first saw it, and the motorcycle went between a half and two-thirds of a block. The front of the motorcycle collided with the left side of the Owen car, turning it around. She did not see any red lights after the motorcycle passed her, except the tail light. She saw no reflections of red light. She did not hear a siren at all.

The driver of the Volkswagen testified he was alongside the Butcher car when the motorcycle passed. He saw the motorcycle just a fraction of a second as it passed; it was going 60 to 65 miles an hour and appeared to be accelerating. He did not at any time see any flashing red light or any reflections of a red light. He did not hear a siren at any time. When he first saw the Owen car it was at the gutter line going about 7 to 8 miles an hour. At that time the motorcycle was 200 to 300 feet from the Owen car.

At the time in question section 454 of the Vehicle Code provided that the driver of an authorized emergency vehicle was exempt from the provisions of the code "when used in the immediate pursuit of an actual or suspected violator of the law," and that the exemption applied "only when the driver of said vehicle sounds a siren as may be reasonably necessary and the vehicle displays a lighted red lamp visible from the front as a warning to others."[1] There was a conflict in the testimony of the witnesses as to whether the motorcycle displayed a lighted red lamp visible from the front end and as to whether the officer sounded a siren. Seven witnesses testified they did not see any red light or hear a siren. One witness testified she saw a red light but did not hear a siren. Three witnesses testified they heard a siren. Thus a vital question was whether the motorcycle displayed a lighted red lamp visible from the front and whether the officer sounded a siren.

The motorcycle was equipped with two red lamps in front which worked in unison. If one was lighted, both were lighted; if one was not lighted, both were not lighted. There

---

[1] Section 454 is now sections 21055 and 21056 of the Vehicle Code.

was a switch on the right handlebar to turn the red lamps on and off. Sergeant Root, who made an investigation at the scene shortly after the accident, testified the switch for the red lights was "half-way between on and off," and if the switch was in that condition at the time of the accident the red lights were off. The officer first said he could not remember anything about the front red light lenses. Asked, "Do you remember—I am referring to the red lights now and particularly the red light on the left, that would be as you are sitting on the motorcycle, the left headlight, do you remember if there was some of the wiring left where the bulb had been broken?" he replied, "No, I can't remember. I'm sorry." Later he said the left red light "was cracked, but had not fallen out."

The motorcycle was taken to the garage of Joe Willis in Pomona and later to Harry Rathbun's Motorcycle Shop, also in Pomona. Willis was instructed to keep the motorcycle behind a fenced area where it would not be accessible to the public. Willis testified the motorcycle was stored on his lot about two and one-half to three weeks; during that time he did not make any repairs or changes of any sort on it; as near as he could recall, the right red light "was completely smashed and the glass was all gone. The left one was still in there but it was cracked with a small portion out of the bottom. Q. Now, was part of the glass out? A. I believe there was a small fragment out of it." Rathbun maintained the city's motorcycles. He was instructed not to repair the motorcycle, simply to store it. He testified he obtained it from Willis between two and three weeks after the accident; while it was in his possession no repairs were made to it; up until about a week before he testified, no portion of the motorcycle had been removed or changed, it was in the same condition it was when it first came into his shop; at that time the left front red lamp was removed and it, together with a piece of glass and some filament, was kept by him until the morning of the day he testified; on that morning Dr. Dino Morrelli had picked it up; if the siren was on at the time of the collision it would spin a short time after the impact.

Dr. Dino Morrelli was called as an expert by defendant. He testified he is a graduate in civil, mechanical, and aeronautical engineering; he is a Master of Science in aeronautics, a Master of engineering and mechanical engineering, and a Doctor of Philosophy in civil, mechanical, and aeronautical engineering. He had taught machine design, structures, and

transportation at California Institute of Technology. He had worked with electric wiring systems, had built automatic, controlled machines involving electrical and mechanical circuits. He had had training in physics of light, sound, electricity, materials, and electronics. He had had a course in optics.[2] He testified: "Q. Have you done any practical work in using the physics of light refraction? A. Yes, sir. That is in '47 to '53 when I ran a research project at the Cal-Tech campus, which involved a design and use of various optical devices for seeing things in motion and standing still. Now, that sounds like moving pictures, but it isn't. Q. Do you feel qualified to testify concerning light refraction and reflection, Doctor? A. Yes, sir." On cross-examination he was asked, "Are you an expert on photographs, Doctor?" He answered, "I know my photography, but I have never appeared as an expert on photographs as such."

Dr. Morrelli testified he understood the wiring system in a Harley-Davidson motorcycle. About a week before testifying he examined the motorcycle in question at Rathbun's, particularly the red lamps. The red lamps were not "sealed beams." They had been forcibly smashed. There was no glass left in the right lamp; the filament was broken off. He took a piece of glass out of the bevel of the left lamp. He examined the wiring leading from the battery to the switch under the right handlebar that turns the red lights on and off. If the red lights were working properly they would both be on or both be off. In the left lamp the red lens was "broken out"; a piece of the glass was in the rim; the bulb which envelops the filament was broken; the stem and filaments were complete; the base, which is the middle part, was firmly in position; the filaments had no tungsten oxide deposit on them. If the red light was on when it was broken, at the time the oxygen of the air hit the filaments oxidation would occur which would leave tungsten oxide on the filaments. If the red lamp was not lit, no such deposit would occur.

Shown a photograph of the motorcycle and a Chevrolet police car standing nearby, taken at the scene the night of the accident, the witness was asked if he could tell from the photograph whether the lens in the left red light of the motorcycle was broken. He answered, "Yes." Asked whether in his opinion it was broken, he answered, "It is broken out." The

[2]Optics is the science treating of light, its genesis and propagation, the effects which it suffers and produces, and other phenomena closely associated with it. (Webster's New Inter. Dict., 2d ed., p. 1711.)

reasons the witness gave for his opinion are stated in the margin.[3]

The witness examined the siren. It was in good working order and unbent. The pitch the siren puts out depends on how fast the motorcycle is going. If the motorcycle is going at a fast rate the siren "will put out a high pitch. If it runs, it will put out a low pitch. Now, at any time you take your foot off the lever, the siren drive wheel comes away from the tire and the siren spins free and it growls down if you don't put it back on the tire again. It will growl down until it is quiet." If the motorcycle was traveling 60 to 65 miles an hour and the siren was on, it would continue to emit sounds for at least 10 seconds.

On the conclusion of Dr. Morrelli's testimony as to the siren, counsel for defendant offered to prove by Dr. Morrelli that in his opinion, based on his examination of the left red lamp, if the lens in that lamp was broken the bulb would have been broken by the same force that broke the lens, and that from the metal damage on the lamp and one of the photographs of the motorcycle taken at the scene the night of the accident, in evidence, in his opinion the red lights were not on at the time of the collision. Counsel for plaintiffs objected, as stated in the margin.[4] The objection was sustained. The court then asked counsel for plaintiffs if he considered "that an expert of the pictures can determine whether the lens is in or out?" The reply was, "He can't with absolute certainty. He can be ninety percent." The court stated he was going to overrule the objection, and counsel for plaintiffs said, "One expert can determine it one percent one way and one ninety percent the other way." The court then overruled the objection, stating, "We have got a situation now where it is at least prima facie evidence that the motorcycle was examined by Dr. Morrelli and it was the motorcycle in question where there is at least prima facie evidence that the motor-

---

[3] "Well, in the black and white photograph, a lens such as in this spotlight would show with dark. I said black at one time, but dark is a better description. That is illustrated in the back end of the Chevy. You will see that the red tail light looks dark, which is red, where the back-up lights it shows white. That is a transparent lens underneath but the top one is red, a red one."

"Q. And the reason for that is because it appears so right on the photograph? A. That's right. If it wasn't, you would see the dark area which is the area of the red spotlight."

[4] "MR. SHELTON: We object to the offer of proof, your Honor, on the grounds that no foundation has been laid, no sufficient foundation has been laid; upon the further grounds it is incompetent, irrelevant and immaterial, calling for improper conclusion of this witness."

cycle in question is in the same condition that it was at the time that it was brought into Mr. Rathbun's shop, approximately two weeks after the accident. . . . We have the witness's opinion that as far as the lights are concerned, they were in the same condition when he saw it as they are in the photograph. Now, if it is conceded that an expert can with ninety percent accuracy determine an expressed opinion from the photograph whether it is your expert or anybody else's expert and that is the question that I asked you and which concession you made at the Bench, then I think we have got a prima facie case on the situation.''

Dr. Morrelli then testified the impact which caused the damage to the left red lamp shown in the photograph previously referred to would have broken the bulb in that lamp. The reasons he gave for his opinion are stated in the margin.[5] Referring to the left red lamp itself, he was of the opinion the bulb was not on at the time the bulb was broken. The reasons he gave for his opinion are stated in the margin.[6] He could tell from the filament post that the bulb in the left red light was not on at the time the lens was broken because it had no tungsten oxide coloring on it. The doctor then took two unbroken good light bulbs, broke a lighted one showing tungsten oxide deposit on the filaments, and broke the other which was not lit showing the absence of tungsten oxide deposit on the filaments. There was no objection to the experiment. There was no deposit of tungsten oxide on the filaments of the left red lamp on the motorcycle.

---

[5] ''You see, when you install the bulb in that spotlight, there is very little space between the lens, the red lens and the top of this glass envelope or the bulb. If it takes a shock which breaks it across the center, this will get a shock too and it will break.''

[6] ''If a bulb is lite, the filament is hot. It is up to several thousand degrees centigrade and if you let air or oxygen get to that filament when it is hot, it will show a characteristic colorization in this yellow tungsten oxide. Now, this filament in this bulb was not discolored in any way when I examined it. It isn't discolored now except the filament is no longer on the posts. The filament on this spotlight at the time I examined it was also continuous. In other words, if I had a battery and put a battery under this on this spotlight, it would have lite up for a couple of seconds. It was continuous. It was all there. Now, the fellow that broke it off was me because I tried to get this bulb out by putting a han[d]kerchief around the broken part, by twisting it out is how it is supposed to come out. With the han[d]kerchief over it, it fell into an envelope which I already provided for the purpose which is here in Court somewhere. Now, if it had been lite when the bulb broke, it would have been colored with tungsten oxide, almost a canary yellow. It would have been discontinuous. It would have burnt out. Now, neither of those things happened.''

On cross-examination Dr. Morrelli testified, after looking at another photograph of the motorcycle taken at the scene the night of the accident, produced by plaintiffs, that it showed the left red lens was out. Further on cross-examination, referring to six photographs taken at the scene the night of the accident, he testified: "Out of that set of six, I have picked the two which show full-face, because in order to detect whether there is a red light or not, you have to find out if the light that comes back to the camera has got the same optical property as the light that left the flash bulb, or whatever illumination that was used. If it had gone through the red lens onto it, reflected, and come back, the light that returns is red, and it's optically different from the light that left, and then I can tell you whether it's a red lens. . . . A red light will photograph dark, yes, sir. . . . Q. All right. Are you convinced in your own mind, Dr. Morrelli—I am just going to ask you this—are you convinced in your own mind that this light based on these pictures is broken, this left light? A. Yes, sir."

Plaintiffs assert the court erred and abused its discretion in permitting Dr. Morrelli to testify concerning the photograph. The argument is that an expert must be qualified in the specialty about which he is to testify, and Dr. Morrelli was not qualified as an expert "in photographic interpretation."

The opinion of a witness may be given "on a question of science, art, or trade, when he is skilled therein." (Code Civ. Proc., § 1870, subd. 9.) ▮▮▮ It is for the trial court to determine, in the exercise of a sound discretion, the qualification of a witness to give his opinion in evidence, and its determination that a witness is qualified to give expert testimony will not be disturbed on review unless a clear abuse of that discretion is shown. (*Harold* v. *Pugh,* 174 Cal.App.2d 603, 612 [345 P.2d 112]; *Williams* v. *Cole,* 181 Cal.App.2d 70, 75-76 [5 Cal.Rptr. 24].) ▮▮▮ Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility. ▮▮▮ The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury. (*Agnew* v. *City of Los Angeles,* 97 Cal.App.2d 557, 565-566 [218 P.2d 66].) ▮▮▮ Opinion evidence is generally admissible in a case in-

volving electrical installations and equipment. (*Bergen* v. *Tulare County Power Co.*, 173 Cal. 709, 715-718 [161 P. 269]; *Robinson* v. *Western States Gas etc. Co.*, 184 Cal. 401, 408 [194 P. 39]; *Young* v. *Bates Valve Bag Corp.*, 52 Cal.App.2d 86, 95-97 [125 P.2d 840].) An expert can express an opinion from a photograph just as he can from a hypothetical question stating the facts which appear in a photograph. (*Ginnelly* v. *Continental Paper Co.*, 57 N.J. Super. 480 [155 A.2d 154, 162-163]; *Leeper* v. *Thornton*, —— Okla. —— [344 P.2d 1101]; 32 C.J.S. 368, § 558.)

In *Woyak* v. *Konieske,* 237 Minn. 213 [54 N.W.2d 649, 33 A.L.R.2d 1241], the court stated (54 N.W.2d 655):

"Nor do we believe that foundation is lacking because the opinion of Almy was based on photographs instead of an examination of the wrecked automobiles. It is common practice for medical experts to base their opinions upon X-rays and other similar descriptive evidence or upon hypothetical questions. Defendant was given free range to cross-examine regarding the accuracy of the photographs. The fact that the opinion was based on photographs instead of an examination of the automobiles might conceivably affect its weight, but would not render it inadmissible because of a lack of foundation if the witness were otherwise qualified and the photographs were sufficiently descriptive and clear so that they presented the facts necessary to enable a witness to form an opinion with the necessary degree of accuracy."

 The case was obviously one for expert testimony. In opposition to the testimony of Dr. Morrelli, plaintiffs produced a witness qualified in the interpretation of photographs who testified that in his opinion examination of the photographs of the motorcycle showed the lens in the left red light was not broken. As we have seen, the trial court's determination that a witness is qualified may only be overturned where he has committed a clear abuse of discretion. We can find no such abuse of discretion. We cannot agree with plaintiffs that because Dr. Morrelli had not theretofore testified as an expert on photography he was not qualified to interpret the photograph of the motorcycle. He had had training in physics of light and electricity. He had had a course in optics. He had done practical work in using physics of light refraction. We cannot say as a matter of law that Dr. Morrelli was not qualified to testify to his opinion as to what appeared in the photograph. Further, he testified to

the same opinion from the left lamp itself as he did from the photograph.

We adopt as part of this opinion the written statement of the trial judge in denying a motion for a new trial: "The second point which must be considered is the alleged error in law in allowing the testimony of the expert witness Mor-[r]elli. I do not believe there was any error in allowing this testimony. The witness's qualifications, and background of study in physics and the refraction of light, would be sufficient to qualify him to express an opinion, although he may not have been experienced in the interpretation of photographs. In view of the fact that the jury was specifically instructed that it was their duty to determine whether the fact (that the lens on the light was broken in the collision) upon which the opinion was based was proved by a preponderance of the evidence, and that unless it was so proved the opinion based thereon was valueless, and the fact that Dr. Mor[r]elli throughout his testimony conceded that his testimony as to the effect of the breaking of the lens was without value unless the lens was in fact broken at the instant of the collision, makes it highly improbable that the jury was in any way misled. It must be presumed that the jury followed the instructions, and no complaint was made in the argument that the instruction was not adequate or proper."

 Plaintiffs assert the court erred in permitting counsel for defendant to ask Dr. Morrelli hypothetical questions which were not based on facts in evidence. They do not refer us to any hypothetical question which was not based on facts in evidence. If we understand plaintiffs correctly, they say defendant was permitted to ask the doctor whether in his opinion the lens in the red lamp was broken when there was no evidence that it had been broken in the collision. As the trial court ruled, there was a prima facie showing that the left red lamp was in the same condition when examined by Dr. Morrelli as it was immediately following the accident. (*Cf. Graves* v. *Union Oil Co.*, 36 Cal.App. 766, 769-770 [173 P. 618].) The point is without merit. (*McClelland* v. *Acme Brewing Co.*, 92 Cal.App.2d 698 [207 P.2d 591].)

Plaintiffs say that even if there was some factual basis for the hypothetical questions, such basis was not substantially established. What we have said disposes of this point.

 It is asserted the court erred in permitting Dr. Morrelli to conduct the experiment to show that if the red lamp was on and the bulb broken in the collision, tungsten

oxide would have formed on the filament. There was no error. Plaintiffs did not object to the experiment or to the doctor's testimony with respect to it. It is too late to make the point.

In arguing to the jury, counsel for defendant wrote on a blackboard four possible verdicts the jury could return: (1) Both parties were negligent—neither could recover; (2) neither party was negligent—neither could recover; (3) if defendant was negligent, plaintiffs could recover; (4) if Officer Poggetto alone was negligent, defendant could recover. By inadvertence, the blackboard with the writing on it went into the jury room with the jury. Plaintiffs assert prejudicial error. We find none. The writing was consistent with the court's instructions and was not an incorrect statement of the law. The irregularity was one of the grounds of a motion for a new trial. In denying the motion, the trial court said:

"[T]he blackboard was requested by the jury for the purpose of having a place to post the maps and other exhibits that were in evidence, and there is no showing that the exhibits were not at all times covering the written matter, nor is there any showing that the items written on the blackboard did not correctly state the law in the respects that were referred to therein. The error and inadvertence in this case would appear to be no greater, and probably substantially less, than that of allowing an exhibit, marked for identification only, to go into the jury room. In *Newton* v. *Thomas,* 137 Cal.App.2d 748 [291 P.2d 503], this was held not to be sufficiently prejudicial to require the granting of a new trial. Based on the authority and reasoning of that case, the court feels that the error here was not sufficiently prejudicial to require a new trial to be granted." We agree.

Affirmed.

Shinn, P. J., and Ford, J., concurred.