[Civ. No. 1768.   Third Appellate District.—April 12, 1918.]

## LAURA A. GRAVES et al., Respondents, v. UNION OIL COMPANY OF CALIFORNIA (a Corporation), Appellant.

NEGLIGENCE—DEATH IN BURNING OF ASPHALT-SHED—DISCHARGE OF GAS-SEAL INTO DITCH—CONTACT OF LIQUID WITH FURNACE FIRES.—In an action against an oil company engaged in the distillation of asphalt for the death of an employee through fire in an asphalt-shed communicated thereto by burning oil, actionable negligence is shown by evidence of the discharge of the liquid contents of a gas-seal into a ditch running near certain furnaces, whereby the oil was ignited.

ID.—HYPOTHETICAL QUESTIONS SUPPORTED BY EVIDENCE.—In this action, hypothetical questions as to whether inflammable oil would be condensed and formed on the water in the gas-seal, and as to the results if such burning oil entered the trap, *held* supported by the evidence. ·

ID.—FORM OF HYPOTHETICAL QUESTIONS — DISCRETION — APPEAL.—A large discretion relating to the form of hypothetical questions must necessarily rest with the trial judge, and the appellate court is justified in placing much reliance upon his decision in passing upon the sufficiency of the facts narrated in the questions.

ID.—HYPOTHETICAL QUESTION—BASIS OF.—A hypothetical question on which the opinion of an expert is to be based must include only such facts as are supported by evidence, but it may include any state of facts which the evidence tends to prove and which the jury might reasonably find to be proven.

APPEAL ·from a judgment of the Superior Court of Contra Costa County.   A. B. McKenzie, Judge.

The facts are stated in the opinion of the court.

Chickering & Gregory, Frank H. Gould, A. V. Andrews, and A. F. Bray, for Appellant.

Elmer E. Nichols, Stetson & Koford, T. D. Johnson, and A. T. Shine, for Respondents.

CHIPMAN, P. J.—Plaintiffs bring the action as heirs at law of Warren Graves, deceased, who was burned to death while employed by defendant and through the alleged negligence of defendant. The appeal is from the judgment on the verdict in favor of plaintiffs.

The cause of action is identical with the case of *Hallawell* v. *Union Oil Co.* (No. 1767), *ante*, p. 672, [173 Pac. 177]. Both Hallawell and Graves lost their lives at the same time and under identical circumstances. Each case was tried before a jury and in each plaintiffs had the verdict. The judgment in No. 1767 was affirmed. The facts and circumstances surrounding the accident causing Graves' death are fully set forth in the opinion in cause No. 1767 and need not be here repeated. The testimony of witnesses in the present case is not, nor was it at all likely to have been, literally the same as when given by the same witnesses in the Hallawell case. But obviously, if the testimony was substantially the same in both cases and was deemed sufficient to support the verdict in favor of plaintiff in the Hallawell case, a like verdict in the present case must also be held to have support, and the judgment should be affirmed unless some error of law crept into the case at the trial of sufficient gravity to require a reversal.

The contention of appellant here, as it was in the Hallawell case, is: 1. That there is no proof of negligence in connection with the asphalt-shed; 2. That there is no showing of causal connection between the fire in front of the stills and the fire at the asphalt-shed; 3. There is no showing of negligence upon the part of defendant in connection with the fire in front of the asphalt-stills. But one assignment of error is relied upon, namely, that the court erred in permitting answers to the hypothetical questions put to the witness Cooper.

The present case was tried some time after the trial in the Hallawell case and was conducted without change of attorneys on either side. It is not likely that plaintiffs would fail

to make as strong a showing in support of their contentions in the second trial as they did in the first. We think in some respects the showing is stronger. As to appellant's first point, we thought the evidence in the Hallawell case, and we think the evidence in this case was sufficient to establish actionable negligence in discharging the liquid contents of the gas-seal on to the ground in a way to cause it to run along the ditch in front of the stills and over the ground around and near the trap, and so as to quickly take fire as it did from the furnaces under the stills. This was the initial act of defendant's negligence which we held in the Hallawell case and which we think in the present case was shown to have caused the fire at the asphalt-shed. There was evidence in the present case that the inflammable oil in this fluid was seen burning within two or three feet of the trap, a foot nearer than appeared in the Hallawell case. It was shown, too, that the temperature of this fluid was raised after it left the gas-seal as was also the water flowing in the ditch which came from the condensers, by the heat from the furnaces and by the burning oil on the surface of the fluid which came from the gas-seal; and that this increased temperature would cause inflammable vapor to rise from the trap, become ignited by the flame near the trap, and thus ignite the oil in the trap on its way down to the asphalt kettles through the eight-inch pipe. We do not think it necessary to recite the evidence. In our opinion it strengthened rather than weakened the showing in the Hallawell case. We think, too, that the evidence tending to show a causal connection between the fire at the asphalt-shed and the fire in front of the stills was equally satisfactory, if not more convincing, than at the first trial. There was no evidence upon which any rational theory could be predicated that the fire started at the asphalt-shed otherwise than by the burning oil carried through the eight-inch pipe. That there was negligence on the part of defendant shown in connection with the fire at the asphalt-shed appeared even more strongly than at the Hallawell trial. It will be recalled that this shed was an open wooden building of size 130x150 feet, with a wooden floor, and that the asphalt kettles were at the side of the part of the building called a "lean-to"; the asphalt was drawn from the kettles through long metal nozzles into barrels; to facilitate the drawing off of the asphalt which

became cooled, particularly in these spouts, the practice was
to build fires of old barrel staves under these spouts and feed
the fire with distillate brought in buckets—cans nailed to
sticks; these fires gave off large quantities of black smoke,
which caused inflammable soot to fasten itself on the posts,
roof, rafters, and other parts of the building, though most
of these surfaces were covered with galvanized iron; the bar-
rels, when filled, were wheeled across the floor to the platform
on the west side of the building or were stored in the build-
ing; it was the custom to cover the floor with sand to absorb
the asphalt spilled in moving the barrels or which came from
leaking barrels; this covering was often saturated with asphalt
and would then be removed and fresh sand supplied in its
place; around the kettles inflammable material was allowed to
accumulate. The second story was used both as a workshop
and for storage of barrels and barrel material, as fully
described in the Hallawell case. The rapidity with which the
building was enveloped in flames and the upper story filled
with suffocating smoke caused by the accumulated soot was
very convincing evidence of the dangerous character of the
building. We have nothing to add to what was said in our
former opinion as to the unsafe place in which deceased was
placed to work. Our conclusion was, and still is, that these
two men lost their lives by reason of conditions with which
defendant caused them to be surrounded while at work and
which defendant could have avoided by the exercise of ordi-
nary care. This conclusion may be reached in the present
case, regardless of the origin of the fire, since the deceased
was in no degree responsible for the fire, in no degree con-
tributed to the accident which caused his death, and since
under existing statutory law the defenses of assumption of
risk and fellow-servants' negligence have been abrogated.

There remains to notice the alleged error of the court in
permitting expert witness Cooper to answer certain hypo-
thetical questions. There were several of these questions,
and to ascertain whether or not the court erred in its rul-
ings, one must read more than one hundred pages of the type-
written record. It will be observed in doing so that the court
took an active and, we think, an impartial part in an en-
deavor to make the questions conform to the rules governing
this class of testimony. In some instances alleged facts were
eliminated as not proven; in other instances facts deemed

essential were by leave of the court proven and afterward incorporated in the questions. Throughout this prolonged examination of the witness, defendant's objections were not only clearly made but were supported by such reasons as defendant's counsel deemed pertinent or necessary to advance, to all which the court gave attentive consideration. The court showed entire familiarity with the facts testified to and its rulings showed a purpose to allow no question that was not fairly deducible from facts proven. The trial judge is in a position to have the circumstances far more clearly before him than the appellate court can have them. A large discretion relating to the form of the question must necessarily rest with the judge. Where many facts and circumstances, as in this case, are made the basis of the question, the appellate court is justified in placing much reliance upon the decision of the trial court in passing upon the sufficiency of the facts narrated in the question.

We have given this part of the record such attention as satisfies us that no prejudicial error was committed by the court by any of its rulings upon these hypothetical questions. The rule is that "a hypothetical question on which the opinion of an expert is to be based must include only such facts as are supported by evidence; but it may include any state of facts which the evidence tends to prove and which the jury might reasonably find to be proven." (11 R. C. L., p. 579.) "The evidential facts are usually in dispute; neither counsel nor witness knows what the jury will find to be the actual facts proven, and the witness cannot be allowed to give an opinion based on hearsay or on his own idea of what constitutes evidence. Nevertheless, each party has the right to lay before the jury the scientific inferences properly deducible from the facts which he claims to have proved, subject to the contingency that the jury shall find such facts to be as claimed. . . . The solution of this problem which has been worked out by the courts is to permit counsel to put to the expert, after his competency has been established, a question in which the things that counsel claims to have proved are stated as a hypothesis, and the witness is asked to state and explain the conclusion which, in his opinion, results. Then if the jury should find that the facts assumed in the question have been proved by the evidence, they may use the technical information and instruction obtained from the ex-

pert in determining the ultimate facts; but if they should find that the facts assumed in the question are not true, then of course the opinion based on them should be wholly disregarded.'' (Id., 578.) Mr. Jones, in his Commentaries on Evidence, volume 2, sections 370, 371, says: ''The facts are generally in dispute; and it is sufficient if the question fairly states such facts as the proof of the examiner fairly tends to establish. A question should not be rejected because it does not include all the facts, unless it thereby fails to present the case fairly. The truth of facts assumed by the question is in doubtful cases a question for the jury; and, if they find that the assumed facts are not proved they should disregard the opinions based on such hypothetical questions; and the court will so instruct them.'' We are quite convinced from an examination of the record that plaintiffs' counsel formulated and presented their hypothetical questions in good faith and that they were based upon facts proven and fairly stated and upon inferences fairly deducible from the facts proven. It may be stated that the opinion of the witness, whose competency as an expert was not disputed, was sought to show whether, under the conditions stated in the question, inflammable oil would be condensed and form on the water in the gas-seal. He answered it would. The contention of defendant was that no oil would be condensed in the gas-seal, for the reason that it was all condensed as it passed through the condensers; that witnesses had so testified; that one witness, Del Monte, testified that six months before the accident he had repaired the gas-seal and found it necessary to empty the contents on the ground and he observed no oil. There was evidence that while the condensers were designed to precipitate practically all available oil in the gases passing into them from the stills, the process did not arrest all of it. The undisputed fact was that oil did accumulate in this gas-seal after the gas had passed through the condensers and when the contents of the gas-seal ran into the trench and on the ground around the trap it quickly took fire. It was oil that burned, for the seal contained only water and gas and there was no possible way for oil to be found there except by condensation of gases.

There was evidence that the liquid, negligently, as we think, poured on the ground out of the gas-seal—sixty or seventy gallons of it—ran down the trench in front of the furnaces

and was seen while burning not far from the opening of the six-inch pipe which ran to the trap, and also around the trap and within two or three feet of it; that the flames rose up from the burning fluid two or three feet; that a high wind was blowing from the southeast across the furnaces and across the trap; the distance from the intake of this six-inch pipe to the trap and the slant or grade were shown and that the outlet of this pipe was so placed at the trap as that the top of the pipe would always be about an inch under water in the trap; the construction of the trap was shown to be of brick and about eighteen inches square and was open at the top and flush with the surface of the ground; that an eight-inch pipe carried the contents of the trap down to the asphalt kettles; these and other facts and circumstances appeared, some of which are set forth in the opinion in the Hallawell case. Subsequent hypothetical questions had to do with the result which would follow, assuming that the water carrying on its surface this burning oil in the trench in front of the stills, under the conditions mentioned in the questions, entered the six-inch pipe; and also as to what would happen on the assumption that oil on the water in the trap was ignited by the burning oil coming through the six-inch pipe or in some other manner. The testimony of the expert was that, from causes he fully explained, the oil would be forced through the six-inch pipe to the trap; that the oil at the trap would be ignited and pass on down quickly to the asphalt kettles through the eight-inch pipe; that at the admitted temperature of the water in the trench and in the trap, of seventy degrees Fahrenheit, the trap would give off inflammable vapors, and that these vapors being lighter than air, if no wind was blowing, would rise and spread out equally over the sides of the trap, and if there was wind blowing, these vapors would be carried with and in the direction of the wind and would be ignited by the near-by fire burning around the trap, and this fire would follow the burning vapors back to the trap and ignite the oil in the trap, and this burning oil would pass rapidly down the eight-inch pipe to the asphalt kettles.

We have given some of the facts, but by no means all, that were matters of evidence or were inferences deducible from evidence of facts, which the court deemed sufficient as a basis for the expert's testimony. Our conclusion is that the court

did not err in permitting answers to the hypothetical questions above referred to.

The judgment is affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 10, 1918.