[Civ. No. 39172. First Dist., Div. One. Apr. 4, 1978.]

JOHN WILSON HYATT, Plaintiff and Respondent, v.
SIERRA BOAT COMPANY, Defendant and Appellant.

**COUNSEL**

Boornazian, King & Schulze, James G. Boornazian, Lascher & Wilner, Edward L. Lascher and Wendy Cole Wilner for Defendant and Appellant.

White, Giambroni & Walters, Francis R. Giambroni and J. Michael Amis for Plaintiff and Respondent.

**OPINION**

**ANELLO, J.** *—This is an appeal taken from a judgment entered upon a jury verdict in favor of plaintiff. The action is one for damages for personal injuries suffered as a result of an automobile accident on September 22, 1971. The case was tried subsequent to *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], wherein the Supreme Court adopted the comparative negligence system assessing liability in direct proportion to fault.

Sometime after midnight on the date of the accident John Hyatt, plaintiff and respondent herein, was driving a 1960 Volkswagen on a four-lane highway in a westerly direction on Highway 28, near Carnelian Bay, Placer County. He was travelling in the right lane nearest the paved

*Assigned by the Chairperson of the Judicial Council.

shoulder and was near his temporary motel residence when the accident happened.

There were no witnesses to the collision, and plaintiff was unable to supply any information that led up to the accident because of retrograde amnesia. However, the evidence revealed that plaintiff's car struck a glancing blow against defendant's eight-foot-wide boat trailer parked along the highway up against a dike, and thereafter skidded or rolled and had a second impact with a telephone pole.

Defendant Sierra Boat Company operated its business directly across the road from where the accident happened and had been officially warned on previous occasions about parking vehicles on the road. There was extensive testimony as to whether the boat trailer was illegally parked and stuck out in the travelled lane portion of the highway. The boat trailer struck by plaintiff was not registered and had no reflectors.

Plaintiff was 27 years of age and was a journeyman union carpenter prior to the accident. He had worked a full day framing houses and had been awake 18 hours before the accident. There was no direct evidence to indicate that plaintiff drove off the road at the time his car came in contact with the boat trailer.

It should be noted that Highway 28 has been extensively redesigned since the accident, so both parties introduced many witnesses who testified as to its width, the kind of curb, and its condition on the night of the accident. The plaintiff presented a design engineer from the state highway department, two surveyors and a highway maintenance officer. Defendant presented two traffic engineers and two auto accident experts.

There was evidence relating to plaintiff's possible intoxication. One of the police officers testified that he had smelled alcohol while extricating the plaintiff from his car after the accident. Another officer testified that he had not smelled alcohol, and the accident report made no reference to it. A blood alcohol test was taken approximately four hours after the accident. Based on that test, an expert witness testified that plaintiff's blood alcohol content at the time of the accident was between .087 percent and .093 percent.

As to plaintiff's injuries, the evidence showed he suffered amnesia, a contusion which left him with hemiparesis (weakness and stiffness or partial paralysis similar to a condition after a stroke) and some brain

damage as a result of the accident. He was unconscious for over a week and was discharged from the hospital November 3, 1971. He has not held a job since the accident. In December 1971 and May 1972, John Hyatt saw a neurologist at Kaiser Hospital. In June 1972 plaintiff was admitted to the Veterans Administration Hospital in Portland, Oregon for six and one-half months. He received physical therapy and some psychiatric care while a patient there. His condition continued to deteriorate and in May 1974, two and one-half years after the accident, he was diagnosed as having multiple sclerosis. The medical experts agreed that the onset of multiple sclerosis was in no way related to or caused by the accident. Conflicting medical testimony was presented concerning the plaintiff's extent of disability prior to the onset of multiple sclerosis. Evidence also indicated that plaintiff had psychiatric problems in adjusting to his disability following the accident.

An economist called on behalf of the plaintiff testified that plaintiff's loss of earnings due to inability to work from the date of the accident to the date of trial was estimated at $54,900 and that his future loss of earnings projected from the date of trial was $633,300 to a total of $688,200.

The jury returned a special finding fixing plaintiff's damages at $850,000. The jury also found plaintiff to be contributorily negligent in the amount of 40 percent. A net verdict and judgment was thereafter entered on behalf of plaintiff in the amount of $510,000.

Defendant cites numerous errors which were allegedly committed by the trial court and which it contends were prejudicial in fixing liability and assessing damages by the jury, to wit:

1. The trial court improperly rejected defendant's instructions on intoxication.

2. The trial court improperly excluded testimony of an expert witness as to plaintiff's speed prior to the first impact.

3. The trial court's instruction defining the term "curb" was erroneous.

4. The jury was improperly instructed on the subject of damages.

5. The judgment was excessive.

6. The court costs should have been apportioned commensurate with the degree of fault attributable to each party.

## Discussion

■ 1. It was not prejudicial error to fail to give the requested instructions on intoxication.

Defendant proposed and the court refused to give jury instructions BAJI No. 5.40 as modified[1] and BAJI No. 3.45 as modified,[2] and thereby contends it was "clearly error" because a litigant has the right to have the jury instructed on every issue which finds support in the record in the case. In support thereof, defendant quotes from *Zamucen* v. *Crocker* (1957) 149 Cal.App.2d 312, 316 [308 P.2d 384], as follows: "All of the decided cases on the subject recognize that it is negligence as a matter of law to drive a vehicle upon a public highway while in an intoxicated condition."

Plaintiff argues that there was no evidence of intoxication which was substantially supported by the record. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 192, p. 3012.) He contends there were no witnesses that testified he or she saw plaintiff take one drink of any alcoholic beverage, and that there was no evidence that plaintiff was driving in a manner except as permitted by law. We disagree.

---

[1]"Section 23102 of the California Vehicle Code provides in part as follows: 'It is unlawful for any person who is under the influence of intoxicating liquor to drive a vehicle on any highway.' [¶] A person is under the influence of intoxicating liquor when as a result of drinking such liquor his physical or mental abilities are impaired to the extent that he is not able to drive a vehicle in the manner that a sober person of ordinary prudence would drive under the same or similar circumstances. [¶] You have heard evidence concerning the percentage level of alcohol in plaintiff's blood, both at the time the blood alcohol test was taken at the Washoe Medical Center, and at the time accident occurred some hours earlier. You are instructed that if by a preponderance of the evidence you find the facts to be that plaintiff had at the time of the accident a .10% or more of alcohol by weight in his blood, then you shall presume that plaintiff was under the influence of intoxicating liquor at the time of the accident. If, however, you find that at the time of the accident plaintiff had a .05% or more, but less than .10% by weight of alcohol in his blood, then such fact does not give rise to a presumption that plaintiff was or was not under the influence of intoxicating liquor, but such fact must be considered with other competent evidence in determining whether the person was under the influence of intoxicating liquor at the time the accident occurred."

[2]"If you find that plaintiff violated Vehicle Code § 23102, the Statute just read to you, that plaintiff was driving under the influence of intoxicating liquor at the time of his accident, and that such violation of said statute was a proximate cause of plaintiff's injuries, you will find that such violation on the part of plaintiff was contributory negligence."

There was ample circumstantial evidence of plaintiff's possible intoxication. One of the police officers testified that he had smelled alcohol in the car while removing plaintiff from it. It is true another officer testified that he had not smelled alcohol, and the accident report made no reference to it. However, a blood alcohol test was taken at Washoe Medical Center in Nevada approximately four hours after the accident. Plaintiff's attorney sought to establish that the test was unreliable, but the court permitted an expert witness, Dr. Loquvam, to testify. His opinion was that plaintiff's blood alcohol content at the time of the accident was between .087 percent and .093 percent. A presumption of intoxication in criminal cases arises if the blood level is .10 percent. (Veh. Code, § 23126.) Dr. Loquvam extensively commented on the effect of alcohol on impairment of peripheral vision and reflection time.

Whether plaintiff was intoxicated on the evening of the accident was a disputed question of fact. There is no question that there was sufficient evidence from which the jury could have found that plaintiff was driving while intoxicated at the time of the collision. In light of such evidence, was it error for the court to refuse the submitted instructions on being under the influence of intoxicating liquor?

BAJI No. 5.40, as modified, which was submitted was not a correct statement of the law and was therefore properly refused by the trial court.

Defendant's proposed instruction BAJI No. 5.40, as modified, is comprised of certain excerpts from Vehicle Code sections 23102[3] and 23126.[4] Vehicle Code section 23126 specifically states that it applies "Upon the trial of any criminal action, or preliminary proceeding in a criminal action." Defendant has provided no authority where the use of Vehicle Code section 23126 as an instruction is proper in a civil case, and our research has failed to show that such an instruction as submitted by defendant has ever been used and approved in a civil case.

---

[3]Section 23102 of the Vehicle Code provides in part as follows: "It is unlawful for any person who is under the influence of intoxicating liquor . . . to drive a vehicle upon any highway."

[4]Vehicle Code section 23126 provides: "(a) Upon the trial of any criminal action, or preliminary proceeding in a criminal action, arising out of acts alleged to have been committed by any person while driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the person's blood at the time of the test as shown by chemical analysis of his blood, breath, or urine shall give rise to the following presumptions affecting the burden of proof:

■ In order to complain of failure to instruct on a particular issue the aggrieved party must request the specific proper instructions. (*Carbaugh* v. *White Bus Line* (1921) 51 Cal.App. 1, 5 [195 P. 1066]; *Barrera* v. *De La Torre* (1957) 48 Cal.2d 166, 170 [308 P.2d 724]; *Phillips* v. *Noble* (1958) 50 Cal.2d 163, 166 [323 P.2d 385]; *Gaspar* v. *Georgia Pac. Corp.* (1967) 248 Cal.App.2d 248, 251 [56 Cal.Rptr. 243]; *Switzer* v. *State of California* (1969) 269 Cal.App.2d 627, 636 [75 Cal.Rptr. 371].) It is the responsibility of counsel to propose correct instructions and the court has no duty to modify erroneous instructions submitted to it, and there is no error if it simply rejects such instructions. (*Shaw* v. *Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158 [323 P.2d 391].) As stated in *Rogers* v. *County of Los Angeles* (1974) 39 Cal.App.3d 857, 862 [114 Cal.Rptr. 540], "The court may properly reject defective instructions and need not correct them."

■ Furthermore, the duty of the court is fully discharged if the instructions given by the court embrace all the points of the law arising in the case. (*Dowdall* v. *Gilmore Oil Co., Ltd.* (1936) 18 Cal.App.2d 1, 5 [62 P.2d 1051]; *Chandler* v. *Benafel* (1934) 3 Cal.App.2d 368, 371 [39 P.2d 890]; *Dodge* v. *San Diego Electric Ry. Co.* (1949) 92 Cal.App.2d 759, 763 [208 P.2d 37]; *Rangel* v. *Graybar Electric Co.* (1977) 70 Cal.App.3d 943, 947 [139 Cal.Rptr. 191].)

A party is not entitled to have the jury instructed in any particular phraseology and may not complain on the ground that his requested instructions are refused if the court correctly gives the substance of the law applicable to the case. (*City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 408 [82 Cal.Rptr. 1].)

---

"(1) If there was at that time less than 0.05 percent by weight of alcohol in the person's blood, it shall be presumed that the person was not under the influence of intoxicating liquor at the time of the alleged offense.

"(2) If there was at that time 0.05 percent or more but less than 0.10 percent by weight of alcohol in the person's blood, such fact shall not give rise to any presumption that the person was or was not under the influence of intoxicating liquor, but such fact may be considered with other competent evidence in determining whether the person was under the influence of intoxicating liquor at the time of the alleged offense.

"(3) If there was at that time 0.10 percent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of intoxicating liquor at the time of the alleged offense.

"(b) Percent by weight of alcohol in the blood shall be based upon grams of alcohol per 100 milliliters of blood.

"(c) The foregoing provisions shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether the person was under the influence of intoxicating liquor at the time of the alleged offense."

Assuming the jury should have been instructed on the issue of intoxication, we find that such an assumed error was not prejudicial. The court did instruct the jury in accordance with BAJI No. 14.90[5] and BAJI No. 14.91,[6] that comparative negligence was to be determined from all the surrounding circumstances as shown by the evidence and that plaintiff's damages were to be reduced in proportion to which plaintiff's negligence proximately contributed to his injury.

In *Stickel* v. *San Diego Elec. Ry. Co.* (1948) 32 Cal.2d 157, 169 [195 P.2d 416], the court stated: "An instruction specifically directed to drunken driving as negligence could have been given but, in the circumstances, the failure of the court to modify and give defendants' proposed instruction does not appear to have prejudiced them. The jury were adequately instructed in general terms as to negligence, contributory negligence and proximate cause. To assume that they did not consider the question of Mrs. Stickel's asserted intoxication under these general instructions would be to attribute to the jury a lack of ordinary intelligence or deliberate violation of duty."

In the instant case, we can assume that since defendant presented evidence of plaintiff's alleged intoxication, and further argued the effect of intoxication to the jury, and the jury having been instructed on negligence, contributory negligence and proximate cause, and the jury having found plaintiff to be 40 percent contributorily negligent, that the jury gave such evidence on intoxication the weight to which it was

---

[5]"If you find that plaintiff's injury was proximately caused by a combination of negligence of the defendant and contributory negligence of the plaintiff, you will determine the amount of damages to be awarded by you, as follows:

"First: You will determine the total amount of damages to which the plaintiff would be entitled under the court's instructions if plaintiff had not been contributorily negligent.

"Second: You will determine what proportion or percentage is attributable to the plaintiff of the total combined negligence of the plaintiff and of the defendant whose negligence proximately contributed to the injury.

"Third: You will then reduce the total amount of plaintiff's damages by the proportion or percentage of negligence attributable to the plaintiff.

"Fourth: The resulting amount, after making such reduction, will be the amount of your verdict."

[6]"In order to determine the proportionate share of the negligence attributable to the plaintiff, you will of necessity be required to evaluate the combined negligence of the plaintiff and of the defendant whose negligence proximately contributed to plaintiff's injury.

"In making this evaluation, you are instructed that it is the negligence of such persons that you must measure and not the mere physical causation for the accident.

"In comparing the negligence of such persons you should consider all the surrounding circumstances as shown by the evidence." (Requested by plaintiff and defendant.)

entitled. We therefore find that the failure of the court to properly instruct *sua sponte* on the issue of intoxication was neither error nor prejudicial.

 2. It was not prejudicial error to exclude testimony of expert witnesses.

After plaintiff rested his case in chief, it was made known that defendant's first witness was to be Professor Frank Arnold, admittedly an expert mechanical engineer, who was expected to testify that plaintiff's probable speed prior to the initial impact with the boat trailer was 60-62 miles per hour, the speed limit being 40 miles per hour. Prior to said witness being called, plaintiff asked to make a motion outside the presence of the jury. In essence, the motion was to exclude any testimony by Professor Arnold that would make reference to any braking, skidding or rolling of plaintiff's vehicle between the two points of impact, namely the impact with the boat trailer and the impact with the telephone pole. The alleged reason for the exclusion was based on Professor Arnold's deposition taken prior to trial. Plaintiff urged that there was no legally admissible evidence upon which he could base any opinion as to plaintiff's speed since there was no foundational evidence upon which to base a hypothetical question to elicit such a conclusion.

Plaintiff's motion was in the nature of a motion *in limine,* and evidently the procedure was not objected to by defendant. The advantage of such motions is to avoid the obviously futile attempt to "unring the bell" in the event a motion to strike is granted in the proceedings before the jury. (Evid. Code, § 402; Brosnahan, Trial Handbook for Cal. Lawyers (1974) § 206, p. 252; see also *Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].)

Up to the time plaintiff made his motion to exclude Professor Arnold's testimony as indicated above, there had been no evidence presented in the trial of any sliding or rolling in any way of plaintiff's vehicle prior to the second impact with the pole. Based on Professor Arnold's description, it was anticipated that he would testify as to the speed of plaintiff's vehicle prior to its initial impact with the boat trailer based on the assumption of a braking concept between the two impacts. Defendant's only "offer of proof" during the hearing held outside the presence of the jury was defense counsel's representation of the expert witness' opinion that "he believes it [i.e., the braking action by sliding or rolling] *could* have been made by the curbing as the car was rolling." (Italics added.)

When asked by the court what evidence was before Mr. Arnold to base an opinion that the car rolled, defense counsel stated: "What I think, he testified in his deposition that that mark, the crease that they now claim is a guy wire *could* have been when it impacted the curbing." (Italics added.)

These statements by defense counsel were the only offer of proof as to the matter upon which Mr. Arnold could base his opinion as to speed before the first impact. ■ As the court pointed out "even an expert witness cannot be permitted just to testify in a vacuum by [*sic*] things that he might think could have happened."

It is apparent that the defendant's proffered evidence would have been speculative, conjectural and remote in nature and could very well have confused the jury. (*Culpepper* v. *Volkswagen of America, Inc., supra,* 33 Cal.App.3d 510.) Therefore the court properly rejected such speculation,[7] and defendant's case proceeded. Other than adding that Mr. Arnold would have testified that the speed, based on such assumptions, was in the area between 60-62 miles per hour, defendant made no further effort to pursue any foundation or present any matter upon which the witness could render his opinion.

An expert opinion must not be based upon speculative or conjectural data. (*Long* v. *Cal.-Western States Life Ins. Co.* (1955) 43 Cal.2d 871 [279 P.2d 43]; *Roscoe Moss Co.* v. *Jenkins* (1942) 55 Cal.App.2d 369 [130 P.2d 477]; Evid. Code, § 801.)

It is well settled that an expert's assumption of facts contrary to the proof destroys the opinion. (*Winthrop* v. *Industrial Acc. Com.* (1931) 213 Cal. 351, 354-355 [2 P.2d 142].) Also as one appellate court has pointed out, "It is impossible for any expert basing his testimony solely upon other evidence introduced in the case thus to lift himself by his own bootstraps. If his opinion is not based upon facts otherwise proved, or

---

[7]Based on the following comments made by the court as to why Dr. Arnold's proffered evidence would not be admitted, it appears it was exercising its discretion under Evidence Code section 352: "Well, it doesn't go to the weight, only if there is no evidence before the Court upon which he can render an opinion, if the Court feels that it really would not be trustworthy because of what he has to work with.

"Now, as I understand at this point certainly I think you can have him testify as to the angle that the car hit the pole from the pictures and from the damage and from the testimony that has been given.

"Now, it seems to me that where the real problem lies, as I understand, you are going to seek to elicit from him, if that is the case, the speed at the time that he hit the pole. Is that right?"

assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence." (*Estate of Powers* (1947) 81 Cal.App.2d 480, 485-486 [184 P.2d 319].)

It was decided early in this state that a hypothetical question to an expert must be based upon facts shown by the evidence and that the appellate court will place great reliance in the trial court's exercise of its discretion in passing upon a sufficiency of the facts as narrated. (*Rowe* v. *Such* (1901) 134 Cal. 573 [66 P. 862, 67 P. 760]; *Graves* v. *Union Oil Co.* (1918) 36 Cal.App. 766 [173 P. 618].)

Evidence Code section 801 requires that any opinion of an expert be based upon matter that is of the type that reasonably may be relied upon. This inquiry by the trial court can be held in an *in camera* hearing and the test on review is whether or not the trial court abused its discretion in ruling as to whether a proper foundation has been or could be laid. The court has discretion and may exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice, confuse the issues or mislead the jury. (*Culpepper* v. *Volkswagen of America, Inc., supra,* 33 Cal.App.3d at p. 520; Evid. Code, § 352.)

 Based on the facts on this particular issue, and the applicable authorities, Professor Arnold could not testify with sufficient foundation as to the speed prior to the impact with the boat trailer. Furthermore, the trial court, in its ruling, did not foreclose defendant's offer of proof, or further evidence, at a later stage in the trial but, obviously, defendant chose not to go further. Had the trial court admitted the objectionable testimony of Mr. Arnold, it would have necessitated a motion to strike and created possible error, which in this instance the trial court reasonably and properly avoided. (*Winthrop* v. *Industrial Acc. Com., supra,* 213 Cal. 351, cited with approval in *Sears, Roebuck & Co.* v. *Walls* (1960) 178 Cal.App.2d 284 [2 Cal.Rptr. 847].)

Assuming, arguendo, that the refusal to allow Professor Arnold to testify as to plaintiff's speed prior to the first impact was error, it is difficult to see how it was prejudicial in light of the totality of the evidence presented by the defendant. Professor Arnold was permitted to testify that at the time plaintiff struck the pole during the second impact, it was his opinion that plaintiff's vehicle was travelling at least 40 miles per hour, the then legal speed limit, even though it had by then turned broadside and was decelerating, the inference, of course, being, that at the time plaintiff had his first impact with the boat trailer, he was

exceeding the basic speed law, and the jury was so instructed. Once again, we can only assume that the jury followed the court's instructions and gave this evidence the weight to which it found it to be entitled. (*Kastner* v. *Los Angeles Metropolitan Transit Authority* (1965) 63 Cal.2d 52, 58 [45 Cal.Rptr. 129, 403 P.2d 385].)

■ 3. The court's instruction on the definition of a "curb" was not error.

Defendant contends that the jury instruction defining "curb" was prejudicially misleading. In effect the thrust of defendant's argument is that the definition used was antiquated and too restrictive to have any real application to the facts in the case at bench. We disagree.

Defendant's instruction which was submitted and refused by the court is based on the 1911 case of *Domke* v. *Gunning,* 62 Wash. 629 [114 P. 436, 438], and reads as follows: "You are hereby instructed that a 'curb' is any barricade dividing the roadway from the area which may be used by pedestrians."

Plaintiff's instruction which was read to the jury was quoted with approval in *Clinkscale* v. *Germershausen* (1956) 145 Cal.App.2d 76, 89 [302 P.2d 23], and it read as follows: "Now, you are hereby instructed that a curb is defined as a stone or row of stones or a similar construction of concrete, wood, or other material along the margin of the roadway as a limit to the roadway and a restraint upon and protection to the adjoining sidewalk space." The court then added: "A sidewalk is defined as a walk for pedestrian use at the side of a street or roadway."

It should be noted that the *Clinkscale* court also cited with approval the language used by the defendant.

A close scrutiny of each definition reveals that they contain substantially the same basic ingredients and are fundamentally similar. Analyzing the two instructions, it is impossible to decipher how the use of defendant's instruction would have affected the outcome of the case.

Further, it is doubtful whether any such instruction was required. As stated in *Clinkscale*: "The Vehicle Code itself does not give any definition of the term curb, no doubt because it is a term which is so commonly used and so generally understood." (145 Cal.App.2d at p. 89.) ■ As is stated in 4 Witkin, California Procedure (2d ed. 1971)

Trial, section 216, page 3033, it is not necessary for courts to give definitions of commonly understood words. Nor is there error in defining common terms. (*Taylor* v. *Joyce* (1935) 4 Cal.App.2d 612, 615 [41 P.2d 967]; *Kelley* v. *Hodge Transportation System* (1925) 197 Cal. 598, 607 [242 P. 76].)

4. The jury was properly instructed on the subject of damages.

The defendant claims that there was error in assessing damages, citing three instances. The first was the rejection of defendant's proposed instructions numbers 1[8] and 2[9]; the second was to the effect that the instructions given blurred the thinking of the jury; and the third was that the jury was told to award full compensation despite the presence, if any, of plaintiff's contributory negligence.

The medical facts in this case are somewhat unique. This case does not present us with the usual problem wherein a plaintiff has a preexisting disease or condition which is lighted up or exacerbated by trauma, or where a plaintiff sustains a traumatic injury and then, because of the trauma, is made more susceptible, and he contracts an otherwise unrelated disease. The evidence herein is uncontroverted that there is no medically causative nexus between the collision trauma and the multiple sclerosis. The only relationship between them is that one occurred after the other.

It is important, however, to keep in mind that the evidence shows that Dr. Jaros, who was one of plaintiff's treating doctors and who testified on behalf of the plaintiff, stated that in May 1972 she made a diagnosis that plaintiff was totally disabled and would never be able to return to work

---

[8] "You are instructed that if you find the following:

"1) That plaintiff is afflicted with multiple sclerosis;

"2) That this affliction was not proximately caused or aggravated by the accident in question or the injuries sustained therein; and

"3) That as a result of this affliction the plaintiff is disabled from his occupation;

"Then you may consider the affliction and the extent to which it has caused plaintiff's disability in determining plaintiff's recovery for lost wages and/or lost earning capacity. Restatement Torts 2d § 440."

[9] "You are instructed that if you find the following:

"1) That plaintiff is afflicted with multiple sclerosis;

"2) That this affliction was not proximately caused or aggravated by the accident in question or the injuries sustained therein; and

"3) That as a result of this affliction the plaintiff is disabled from his occupation;

"Then you may not award damages for lost earnings beyond the date you determine that the affliction with multiple sclerosis disabled plaintiff from his occupation. Restatement Torts 2d, § 440."

as a carpenter, and it was not until May 1, 1974—some two years thereafter—that the disease of multiple sclerosis was diagnosed.

It is well settled that where "the disease may have resulted from causes wholly independent of the injury, the person injured is not entitled to recover from the wrongdoer damages on account of the disease unless he shows a causal connection between the disease and the injury." (22 Am.Jur.2d, Damages, § 119, p. 170; Rest.2d Torts, § 432, subd. (1).)

■ Defendant's argument is that the above statement of the law was never articulated to the jurors and by submitting the two forms of instructions referred to in footnotes 8 and 9, defendant sought to elucidate to the jury the legal effect of the subsequent contracting of multiple sclerosis on the issue of damages. We find this argument to be without merit.

In addition to said instructions being confusing, they are also argumentative. Instructions by a court should always be clear and simple in order to avoid misleading the jury. (*Buchignoni* v. *DeHaven* (1937) 23 Cal.App.2d 76 [72 P.2d 159]; *Guerra* v. *Handlery Hotels, Inc.* (1959) 53 Cal.2d 266 [1 Cal.Rptr. 330, 347 P.2d 674].) Neither of the proposed instructions would give the jury the opportunity of determining that the plaintiff was already permanently disabled and prevented from following his occupation as a result of the accident of September 22, 1971, and prior to the contraction of multiple sclerosis.

In urging such proposed instructions, under defendant's theory of responsibility, if it destroyed the plaintiff occupationally by its negligence and, at a later date, the plaintiff contracted a disease which would also have destroyed plaintiff occupationally, then the defendant is absolved from fault for the damage it already had inflicted upon the plaintiff. As noted by Robert J. Peaslee in his article, *Multiple Causation and Damage* (1934) 47 Harv.L.Rev. 1127, damages must be based upon the value at the time of the tortious act. He specifically notes on page 1134: "Of course, it would be no answer for the defendant that the next week after he burned the plaintiff's house a great and innocently caused conflagration swept the site. The value was still there when the defendant did the burning." Professor Prosser supports the analysis of Peaslee and states the value of harm done or the damages is an estimate of worth at the time and place of the wrong. (Prosser, Torts (4th ed. 1971) § 52, p. 321.)

■ Furthermore, "The court should state rules of law in general terms, and avoid reciting matters of evidence. If the instruction embodies detailed recitals of fact drawn from the evidence, in such a manner as to constitute an argument to the jury in the guise of a statement of the law, it is improper. The matter may be entirely legitimate as argument by counsel, for when so used the jury knows that it comes from an interested source and may weigh and consider it accordingly. But it is seriously objectionable to have the same matter injected into the court's charge, which, as the jurors are informed, is binding upon them." (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 211, p. 3028, and cases cited therein.)

■ The defendant further argues that the failure to instruct on the issue of multiple sclerosis as proposed in footnotes 8 and 9, plus the giving of other instructions requested by plaintiff, blurred the necessity of finding that defendant's conduct was causally related to plaintiff's condition, and that the jury, in effect, was further told to award plaintiff all his damages despite his contributory negligence.

We have reviewed all of the instructions read to the jury and when they are considered as a whole, as they must be, we fail to discern any improper emphasis in any of them to warrant the conclusion drawn by defendant. There is nothing in the record to suggest that the jury was in any way misled by any alleged erroneous instructions. Further, the fact that the jury found plaintiff to be 40 percent contributorily negligent belies the position taken by defendant in this appeal.

■ 5. The judgment was not excessive.

Defendant contends that the evidence in the present case is insufficient to support an assessment of total damages sustained by plaintiff in an amount approaching a million dollars, and is therefore excessive. The basis of defendant's argument is that Dr. Robert Cook, the medical expert called by the defense who saw the plaintiff once at the request of defense counsel, testified that it was difficult to apportion the degree of disability that was attributable to the accident and to the multiple sclerosis. In any event, he testified that in his opinion the plaintiff could have gone back to work within six months, and that plaintiff's overall physical and mental condition was no more than 10 to 15 percent attributable to the accident.

As opposed to defendant's evidence, plaintiff introduced the following evidence concerning his personal injuries and his economic losses: From

the scene of the accident, the plaintiff was taken to the Truckee Hospital and then on to the Washoe Medical Center in Reno, Nevada, where he was hospitalized from September 22, 1971, to October 13, 1971, and was diagnosed by Dr. Adolph Rosenauer (a neurosurgeon) as having a "cerebral contusion, lacerations right thigh and right eyebrow, random abrasions and contusions." When the plaintiff was transferred to Kaiser Hospital, Oakland, California, he still had to be restrained and was still confused and disoriented.

From October 13, 1971, to October 21, 1971, plaintiff was in Kaiser Hospital where both his admission and discharge diagnosis by Dr. J. Anderson and Dr. Mario Milch was one of "cerebral contusion with residual left hemiparesis and mental confusion and disorientation."

He was then transferred to Contra Costa County Hospital in Martinez where he was hospitalized until discharged on November 3, 1971, with the diagnosis which was basically the same as his diagnosis from Kaiser Hospital, except that at this point it was noted that he had a right shoulder injury (right acromioclavicular separation, traumatic).

He then returned to Kaiser Hospital, Oakland, on an out-patient basis and was first seen by Dr. Mary Jaros (a neurologist) on December 14, 1971 (she being the only doctor to testify who had examined plaintiff both before and after the multiple sclerosis manifested itself). At that time, she diagnosed plaintiff as having a head injury resulting in left hemiparesis caused by the accident of September 1971.

She followed his progress and again examined him in May of 1972. At that time, her diagnosis of the plaintiff was that of left hemiparesis post-traumatic. In layman's terms, this is very similar to the picture of a stroke victim. In her opinion, the plaintiff would not be able to work as a carpenter, nor would he be able to engage in any occupational activity that would require coordination of both left and right side of the body. As of May 1972 plaintiff's condition was permanent.

In her notes of May 1972 she wrote with reference to a conversation with another doctor: "He has seen no change for the worse in the patient's ability. He feels as I do that he, the patient, had anticipated a full recovery and has just become aware that he will be left with a significant disability. . . ."

On May 26, 1972, she referred plaintiff to a psychiatrist.

Dr. Jaros again examined Mr. Hyatt on May 1, 1974, and her examination notes state as follows: "He now has, in addition to his old hemipareses [*sic* hemiparesis], bilateral cirebellar [*sic* cerebellar] signs and right leg spasticity as well as optic pallor. . . ."

Prior to May 22, 1972, she did not diagnose multiple sclerosis, nor did she see any paralysis on the right-hand side of the plaintiff's body. She diagnosed multiple sclerosis in the plaintiff on May 1, 1974.

Dr. Jaros further testified that, based upon the best medical evidence, nobody knows what caused the multiple sclerosis.

In June of 1972 plaintiff went to Portland, Oregon and sought assistance at the Veterans Administration Hospital there in August of 1972. He was a patient in that hospital for approximately six and one-half months. Since leaving the San Francisco Bay Area he has seen 20 or 25 doctors, including psychiatrists. The plaintiff testified that he was in good health prior to the date of the accident. That, since the date of the accident, he has not been able to work. Furthermore, since the date of the accident he has not been able to walk over a block without the use of canes, to skip, to run, to bowl, to drive nails with a hammer, to dance, or to hike.

Mr. Rayford Wall, the plaintiff's foreman at the time of the accident, saw plaintiff two or three times a month for approximately a year's period following the accident. During that time he observed that the plaintiff didn't get around well and was extremely slow in his movements and walked with a shuffle. Prior to the accident, Mr. Hyatt was a very good carpenter. In his observations of the plaintiff during the period of time following the accident, the plaintiff could not return to work as a carpenter.

Professor Raymond Schultz, who has a Ph.D. in the field of economics (major in economics and a minor in insurance statistics) testified that the loss of salary to plaintiff as a carpenter from September 21, 1971, to the date of trial (Aug. 1975—four years) including fringe benefits, would have been $54,900.

He then assumed that this same carpenter was unable to work as a carpenter for the remainder of his work life expectancy. He computed the total loss of wages, fringes and benefits, capitalized to the present value, in the amount of $633,300.

The defense offered no contrary economic evidence or expert.

The jury was entitled to accept the evidence favoring the plaintiff and reject the evidence favoring the defendant. It has always been the province of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses. The jury may accept part of the testimony of a witness and reject another part. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67 [107 Cal.Rptr. 45, 507 P.2d 653].) These same considerations apply to the jury's apportionment of fault under comparative negligence rules. Furthermore, the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. (*Rangel* v. *Graybar Electric Co., supra*, 70 Cal.App.3d at pp. 945-946.) We are of the view that the totality of the evidence presented amply supports the apportionment made by the jury.

Furthermore, the Supreme Court has stated that the trial court is in a far better position than the appellate court to determine whether a damage award is excessive since the trial court is vested with the power, denied to appellate courts, to weigh and resolve issues of credibility. (*Schroeder* v. *Auto Driveway Co.* (1974) 11 Cal.3d 908 [114 Cal.Rptr. 622, 523 P.2d 662].)

In the case at bench, after defendant argued excessive damages before the trial court in its motion for judgment notwithstanding the verdict and its motion for a new trial, the court made the following comments: "But as the case developed, as far as the jury is concerned, it seemed like there was certainly sufficient evidence for them to determine that he was incapacitated for the rest of his life as a carpenter due to his injuries and having parathesias. Because the testimony that they could have believed could have indicated that he would never be able to work again the rest of his life as a carpenter. [¶] So, I know, as you say $34,000.00 a year, but projected against the type of a person in that situation and the extra things they need and also projecting what carpenters, at least the experts indicate they may be making ten to fifteen years from now, there was a surprising amount of evidence developed to show that regardless of the multiple sclerosis that we had a man that was really a very disabled person."

After making the above remarks, the trial court denied defendant's motion for a new trial.

"A new trial shall not be granted . . . upon the ground of excessive or inadequate damages, unless, after weighing the evidence *the court is convinced from the entire record,* including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657; italics added.)

To say that a verdict has been influenced by passion or prejudice is but another way of saying that the verdict exceeds any amount justified by the evidence. (*Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 491 [130 Cal.Rptr. 786].) In the case at bench, the jury had more than sufficient evidence to render a verdict in the total sum of $850,000 and in the net sum of $510,000. There was evidence that past and future special damages alone without general damages amounted to almost $700,000. We therefore reject defendant's contention that the damages awarded herein were excessive.

6. Court costs should not be apportioned commensurate with fault.

Pursuant to Code of Civil Procedure section 1032, subdivision (a) plaintiff filed a post judgment cost bill in the amount of $4,834.34. Thereafter defendant filed a motion to tax plaintiff's costs so that they would be diminished by plaintiff's 40 percent contributory negligence.

This is a matter of first impression arising out of the Supreme Court's judicially adopted system of comparative negligence in *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804.

In short, defendant argues that since the jury found plaintiff 40 percent negligent and thus diminished his damage award accordingly, by sheer force of the *Li* rationale, plaintiff's costs should, likewise, be reduced.

Recovery of costs in California is controlled by Code of Civil Procedure section 1032 which states, in pertinent part: "In the superior court, except as otherwise expressly provided, costs are allowed of course: (a) To plaintiff upon a judgment *in his favor*; . . . in an action for the recovery of money or damages; . . ." (Italics added.)

Prior to the ruling in *Li,* if a plaintiff was negligent in the slightest amount, he was barred from recovering and the judgment was entered "in favor" of defendant. Under that system, the judgment was necessarily either totally "in favor" of plaintiff, or totally "in favor" of defendant. It was an all or nothing situation. (*Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804.)

Defendant therefore argues as follows: Given the rationale underlying *Li*, it follows that Code of Civil Procedure section 1032 must be reconstrued in light of California's new system of comparative negligence, and the only reasonable construction which emerges is that costs should now be allowed *to the extent* the judgment is "in favor of" the party claiming them. This result is compelled by well established rules of statutory construction: "In construing a statute . . . [t]he court should take into account matters such as context, the object in view . . . [and] public policy, . . ." (*Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)

Since apportionment of damages based on comparative fault is now part of the public policy underlying California tort law, it is clearly necessary to reexamine section 1032 in light of the fundamental changes which the doctrine of comparative negligence has produced.[10]

Counsel for defendant reminds us that by permitting apportionment of costs according to comparative fault, the court will not be climbing out onto a jurisprudential limb. Cost apportionment is currently permitted in a number of situations. It has long been the rule, for example, that "in an equity suit the costs may be apportioned by the court." (*Cerf* v. *Ashley* (1886) 68 Cal. 419, 421 [9 P. 658]; see *Wheeler* v. *First National Bank* (1937) 10 Cal.2d 185, 190 [73 P.2d 889].) Moreover Code of Civil Procedure section 1032, subdivision (c) expressly grants the court discretion, inter alia, to apportion costs between the parties in actions not specifically enumerated in subdivisions (a) and (b). (*Hillman* v. *Stults* (1968) 263 Cal.App.2d 848, 881-882 [70 Cal.Rptr. 295]; *ABC Egg Ranch* v. *Abdelnour* (1963) 223 Cal.App.2d 12, 19 [35 Cal.Rptr. 487]; *Lockwood* v. *Sheedy* (1958) 157 Cal.App.2d 741, 742 [321 P.2d 862].) Such actions include marital litigation, interpleader and condemnation suits. (4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 96, p. 3253.) It is also instructive to note that Federal Rules of Civil Procedure, rule 54(d)(which provides for the allowance of costs)has been interpreted to vest "in the district court a sound discretion over the allowance, disallowance,

---

[10]The policy underlying recovery of costs is itself unquestionably intertwined with considerations of fault, as this court has expressly indicated: "Costs are allowances which are authorized to reimburse the successful party to an action or proceeding, and are in the nature of incidental damages to indemnify a party against the expense of successfully asserting his rights. '. . . *Thus the party to blame pays costs to the party without fault.* . . .'" (*Purdy* v. *Johnson* (1929) 100 Cal.App. 416, 418 [280 P. 181], quoting in part from *Stevens* v. *Central Nat. Bank of Boston* (1901) 168 N.Y. 560 [153 N.Y.S. 688, 61 N.E. 904, 906]; italics added.)

*or apportionment of costs* in all civil actions . . . ." (6 Moore's Federal Practice (1972) ¶ 54.70[5], p. 1312; italics added; see also *Alameda* v. *Paraffine Companies, Inc.* (9th Cir. 1948) 169 F.2d 408, 409.)

In spite of defendant's persuasive argument that costs now be allowed only to the extent the judgment is "in favor" of the party claiming them, this court is not a "policy making" body and is therefore required to follow existing statutory and case law.

The State of Hawaii has a comparative negligence statute known as the 50 percent system of comparative negligence, in that contributory negligence will not bar a recovery by a plaintiff at fault as long as the amount of that fault remains below 50 percent in comparison with the negligent defendant. (Schwartz, Comparative Negligence (1974) § 3.5, pp. 73-76.) Under *Li* v. *Yellow Cab Co., supra,* California adopted the so-called "pure comparative negligence" rule. (13 Cal.3d 804.) This difference in the two systems of comparative negligence should certainly have no effect on the issue at hand.

A case similar to the one at bench was decided in the State of Hawaii subsequent to our *Li* v. *Yellow Cab Co., supra,* and the court did not apportion costs. In *Abreu* v. *Raymond* (1976) 56 Hawaii 613 [546 P.2d 1013], the Hawaiian trial court in taxing costs permitted the plaintiff to recover only 60 percent thereof in a personal injury action in which the plaintiff recovered judgment by a special verdict that found the plaintiff to be 40 percent negligent. Rule 54(d) Hawaii Rules of Civil Procedure, provides that: "[e]xcept when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs. . . ."

After an appeal from the decision of the trial court, the Supreme Court of the State of Hawaii held: "Proof by defendants of contributory negligence reduced plaintiffs' recovery in this case, but did not result in any recovery by defendants from plaintiffs. Plaintiffs were clearly the only prevailing parties. There was no showing of any fault on the part of plaintiffs in the conduct of the litigation which would have justified exercise of the trial court's discretion to reduce costs. In the absence of such fault, the trial court was without discretion to reduce the costs to which plaintiffs were entitled as prevailing parties under Rule 54(d), H.R.C.P." (*Abreu* v. *Raymond, supra,* 546 P.2d at p. 1014.)

In his authoritative work Schwartz, *supra,* does not address himself to this problem. However, in *Teichner* v. *Klassman* (1966) 240 Cal.App.2d 514 [49 Cal.Rptr. 742], apparently both the plaintiff (lender) and the defendant (borrower) had joined in the violation of the usury laws and the plaintiff, after having brought suit against the defendant, was restricted in his recovery to the principal sum advanced. The court held that the party to whom "the 'net result' of the judgment is favorable is allowed his costs as of course." (*Id.,* at p. 524.) Although this case predates the *Li* case, it is persuasive inasmuch as it was not an "all or nothing situation."

The verdict returned by the jury in the case at bench reads as follows: "We, the jury . . . find a verdict *in favor of* the Plaintiff . . . and against the Defendant . . . and assess damages in the sum of $510,000." (Italics added.) Is there any question that the verdict herein was "in favor" of the plaintiff as provided in Code of Civil Procedure section 1032, subdivision (a)? Does the plaintiff become any less of a prevailing party merely because the jury reduced his total damages by 40 percent? We think not.

Furthermore, there is nothing in *Li* that mandates that the jury must return a special finding wherein it allocates the various percentages of negligence and contributory negligence of the parties. This procedure is strictly discretionary with the trial court. In such a case where the court only has available a general rather than a special verdict, how then will the court apportion the costs between the parties if we were to adopt defendant's suggested apportionment rule?

*Li* did not mandate a diminution of any of plaintiff's rights. Recovery of costs pursuant to Code of Civil Procedure section 1032, subdivision (a) is a right to which both plaintiffs and defendants are entitled depending upon who prevails in the litigation. We see no reason based on law, logic or policy to tamper or modify in any way this right to costs.

Defendant's remaining contentions are similarly without merit.

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied April 28, 1978, and appellant's petition for a hearing by the Supreme Court was denied June 1, 1978.